**BUTTE, ANACONDA & PACIFIC RAILWAY CO., a corporation, Plaintiff,**

v.

**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, a voluntary labor association; Frank W. Glass, individually and as Vice President of the Brotherhood of Locomotive Firemen and Enginemen; J. J. McCarvel, individually and as General Chairman of the Brotherhood of Locomotive Firemen and Enginemen; Brotherhood of Railroad Trainmen, a voluntary labor association; H. E. Nevala, individually and as Deputy President of the Brotherhood of Railroad Trainmen; and R. R. McLean, individually and as General Chairman of the Brotherhood of Railroad Trainmen, Defendants.**

No. 633.

United States District Court
D. Montana,
Butte Division.

Nov. 4, 1958.

912

William M. Kirkpatrick, P. L. Mac-Donald, R. Lewis Brown, Jr., and Joseph B. Woodlief, Butte, Mont., for the plaintiff.

David L. Holland and Edward J. Foley, Butte, Mont., and Harold C. Heiss, and Russell B. Day, Cleveland, Ohio, for the defendants.

MURRAY, Chief Judge.

This cause came on regularly to be heard on the 16th and 17th days of July, 1958, plaintiff appearing by and through its attorneys of record, P. L. MacDonald and R. Lewis Brown, Jr., and defendants appearing by and through their attorneys of record David L. Holland and Harold C. Heiss.

Evidence, both oral and documentary, was submitted and received, and the Court now being fully advised in the premises from the legal evidence introduced, the stipulations of the parties, the admissions in the pleadings, and the legal arguments, makes and orders filed its Findings of Fact and Conclusions of Law as follows:

### Findings of Fact.

#### I.

That plaintiff is a railroad corporation duly organized and existing under the laws of the State of Montana, and as

such operates a railroad in said State, hauling freight as a common carrier for hire and engaging in interstate commerce; that the Brotherhood of Locomotive Firemen and Enginemen is an unincorporated association of persons acting as a collective bargaining agent and the duly authorized representative of plaintiff's employees engaged in serving the plaintiff as engineers, helpers, firemen, motormen, hostlers and hostler helpers; that the defendant Frank W. Glass is an officer of said association, to-wit: an Alternate Vice President; that the defendant J. H. McCarvel is a local officer of said association, to-wit: its General Chairman on the plaintiff railway; that the defendant Brotherhood of Railroad Trainmen is an unincorporated association of persons acting as collective bargaining agent and the duly authorized representative of plaintiff's employees engaged in serving the plaintiff as conductors and brakemen; that the defendant H. F. Nevala is an officer of said association, to-wit: its Deputy President; that the defendant R. R. McLean is a local officer of said association, to-wit: its General Chairman on the plaintiff railway; that this is an action arising under the laws of the United States regulating commerce between the States; that the amount in controversy exceeds the sum of Three Thousand and no/100 Dollars ($3,000), exclusive of costs and interest.

## II.

That plaintiff Butte, Anaconda & Pacific Railway Company is a wholly owned subsidiary of The Anaconda Company, both corporations are managed by the same staff of officers from the President down to and including the Secretary-Treasurer. All major policy decisions for the plaintiff, including those involving labor relations are made for it by its officers, who are also officers of The Anaconda Company, and in making such decisions the controlling consideration is the ultimate effect which the decisions will have on the profits earned by The Anaconda Company.

## III.

That The Anaconda Company has owned and operated an open pit copper mine at Butte, Montana, known as the Berkeley Pit since sometime in 1956; that prior to March 14, 1958, the ores mined at said Berkeley Pit were loaded in plaintiff's ore cars at a loading yard near the said Berkeley Pit known as the old Berkeley Yard; that the work of loading and switching the ore cars in the old Berkeley Yard and between said Berkeley Yard and the West Butte Yard of the plaintiff was, prior to said March 14, 1958, performed by yard crews of the plaintiff, who were members of the defendant Brotherhoods, under the agreements hereinafter referred to; that the said ore cars, when loaded and assembled in the West Butte Yard by the yard crews of the plaintiff as aforesaid, were picked up at the West Butte Yard and moved to The Anaconda Company's smelter at Anaconda, Montana, by the main line crews of the plaintiff, who were also members of the defendant Brotherhoods.

## IV.

That at all times material to this action there were collective agreements entered into by and between the plaintiff and the defendants, Brotherhood of Locomotive Firemen and Enginemen and Brotherhood of Railroad Trainmen, which agreements established the rates of pay, rules and working conditions for plaintiff's employees engaged in engine and train service and switching service; that under said agreements loading and switching of cars within a yard was to be performed by yard crews as distinguished from main line crews which handled trains outside of yards and on the main line of the plaintiff; that under said agreements said yard crews consisted of five men, to-wit: an engineer, fireman, conductor and two brakemen, and such was the make-up of the yard crews which prior to March 14, 1958, had been engaged in the work of loading and switching the cars in the old Berkeley Yard and moving the same to the West Butte Yard of the plaintiff.

## V.

That prior to March 14, 1958, a new loading and switching yard commonly referred to as the new Berkeley Yard and located approximately 3,000 feet from the old Berkeley Yard was constructed by the plaintiff for The Anaconda Company, the cost thereof being borne by The Anaconda Company, and said yard was completed and ready for operation on March 14, 1958. That said new Berkeley Yard does not connect with either the West Butte Yard of the plaintiff or directly with the main line tracks of plaintiff, but trains of ore cars from the new Berkeley Yard are moved over 14 miles of Northern Pacific tracks to Durant, Montana, and thence on to and over the main line of the plaintiff to the smelter at Anaconda, Montana.

## VI.

That on or about September 27, 1957, in contemplation of the completion and putting in operation of the new Berkeley Yard, the plaintiff served upon the defendant Brotherhoods a Section 6 notice under the Railway Labor Act, as amended, proposing an amendment of the aforesaid collective agreements to permit the loading of ore in the new Berkeley Yard with main line crews of the plaintiff rather than yard crews; that thereafter when the said Brotherhoods rejected said proposed amendment, the plaintiff served a second Section 6 notice under the Railway Labor Act, in which it was proposed that the existing agreements be amended to provide that the yard crews in the new Berkeley Yard consist of three men rather than five men, as provided in the existing agreements; that plaintiff offered to the defendant Brotherhoods and their members the work of loading ores in the new Berkeley Yard if the Brotherhoods would consent to the amendment of the existing agreements in either of the aspects proposed by the said Section 6 notices, but the Brotherhoods declined to agree to the amendment of the existing agreements in either respect.

## VII.

That after the plaintiff and the defendant Brotherhoods failed to agree on the changes in the agreements proposed by the aforesaid two Section 6 notices, and on or about October 25, 1957, the defendant Brotherhoods invoked the mediation services of the National Mediation Board and the dispute between the Brotherhoods and the plaintiff, arising under the two Section 6 notices, was docketed by the Board as Mediation Case No. A–5623; a mediator was assigned to the case by the Board and a conference of the parties under the sponsorship of the mediator was held on January 15, 1958. The Brotherhoods continued to be unwilling to agree to the use of main line crews for switching operations or to the use of three-man switching crews. That then plaintiff informed the Brotherhoods that when the work of loading and switching the ore cars was transferred to the new Berkeley Yard, the work would be taken from the plaintiff's employees and would be performed by employees of The Anaconda Company.

## VIII.

By letter dated January 17, 1958, the plaintiff notified the mediator and the defendant Brotherhoods that it was withdrawing the Section 6 notices that led to the dispute docketed as Mediation Case No. A–5623, with the understanding that this withdrawal would terminate the mediation proceedings. The Brotherhoods nevertheless maintained to the Mediation Board that a dispute necessitating mediation continued because of the plaintiff's announcement on January 15 that its employees would cease performing the loading and switching of Anaconda ore cars on the day that the new Berkeley Yard was ready for operation. The Board decided to resume active mediation of the dispute and accordingly advised the parties that conferences would begin on March 5th in Anaconda, Montana; the plaintiff challenged the Board's authority to resume mediation, refused to participate in conferences with the Brotherhoods, and dis-

regarded the Board's request that it withhold making effective the proposed change in the manner of handling, by plaintiff's yard crews, the loading and switching of the ore cars so as to not provoke a strike by plaintiff's employees.

### IX.

By letter dated March 7, 1958, plaintiff advised the Brotherhoods that the loading of ore cars in the new Berkeley Yard would commence shortly; that plaintiff's main line crews would move the trains of ore cars from the new Berkeley Yard over Northern Pacific tracks to Durant and on to Anaconda, and that the plaintiff did not consider the "status quo provisions" of the Railway Labor Act applicable to the contemplated change in the manner of loading and switching Anaconda ore cars. The plaintiff's employees held 15 regular switch-crew jobs and three loading jobs known as a "car dropper", when the loading of Anaconda ore cars in the old Berkeley Yard ceased on March 13, 1958.

### X.

The Brotherhoods representing plaintiff's employees announced on March 11, 1958, that the employees would strike on March 14 because of the plaintiff's refusal to hold matters in dispute in status quo while the mediation proceedings were pending, as required by Section 6 of the Act (Section 156, Title 45 U.S. C.A.). On March 13, 1958, plaintiff obtained a temporary restraining order from the District Court of the Second Judicial District of the State of Montana, in and for the County of Silver Bow, enjoining plaintiff's employees from carrying out their threat to strike, and said cause was removed to this court and a hearing was had on whether the temporary restraining order should be made permanent. The mediator ceased his efforts at mediation when advised on March 13, 1958, that the employees were enjoined from striking.

### XI.

That the work of loading and switching in the new Berkeley Yard is not materially different from the work in the old Berkeley Yard; that the decision as to what employees were to be given the work in the new Berkeley Yard was one to be made by C. H. Steele, who was and is the officer in charge of operations of the Butte, Anaconda & Pacific Railway and also in charge of the Western operations of The Anaconda Company; that if the defendant Brotherhoods had yielded to the request of plaintiff that the collective agreements be modified to provide for a three-man crew in the new Berkeley Yard rather than a five man crew, the work in the new Berkeley Yard would have been given to the Brotherhoods.

### XII.

That in dealing with the Brotherhoods in this instance, The Anaconda Company and Butte, Anaconda & Pacific Railway Company were to all intents and purposes, one employer and the separate corporate entities of the two corporations were used to evade the status quo provisions of the Railway Labor Act.

From the foregoing Findings of Fact the Court makes the following

### Conclusions of Law.

### I.

That this Court has jurisdiction of the parties and the subject matter of this action.

### II.

That the plaintiff is a common carrier engaged in interstate commerce and operates subject to the federal Railway Labor Act.

### III.

That the dispute which led to the instant suit is primarily concerned with the amendment of the existing agreements between the plaintiff and the defendant Brotherhoods in the manner proposed by the two Section 6 notices above referred to, and as such is a "major dispute" subject to the mediatory jurisdiction of the National Mediation Board and mediation of the dispute was necessarily suspended by the Board pending the disposition of this action.

## IV.

That under the terms of Section 6 of the Railway Labor Act (Section 156, Title 45, U.S.C.A.) the plaintiff in this case could not legally have reduced the number of employees in a yard crew from five to three while the Section 6 notice requesting such change was before the Mediation Board; that by virtue of the complete control by The Anaconda Company of the plaintiff Butte, Anaconda & Pacific Railway Company, said companies have accomplished indirectly what the plaintiff company could not have done directly without violating the status quo provision of Section 6 of the Railway Labor Act; that under these circumstances the plaintiff is not entitled to invoke the aid of a court of equity.

## V.

That the temporary restraining order heretofore issued in this cause by the District Court of the Second Judicial District of the State of Montana, in and for the County of Silver Bow, on the 13th day of March, 1958, be dissolved.

Let counsel for defendants submit a draft of judgment in accordance with Rule 11(b) of the Rules of the District Court.

Done and dated this 4th day of November, 1958.

### Opinion

Stripped of all the foliage, the issues presented by this case boil down to these:

1. Is the dispute between the plaintiff and the defendants a so-called "major dispute" to be processed under Section 6 of the Railway Labor Act (Section 156, Title 45, U.S.C.A.), or is it a "minor dispute" to be processed under Section 3 of the Railway Labor Act (Section 153, Title 45, U.S.C.A.)?

2. If, as the Court finds, such dispute is a major dispute, has the status quo provision of Section 6 of the Act been violated?

3. If the status quo provision of the Act has been violated, whether a Court of equity should grant an injunction in favor of a party to such violation?

The Railway Labor Act places the duty on carriers and their employees to exert every reasonable effort to settle all disputes between themselves and provides machinery and procedures for such settlement. Under the Act disputes are divided into two classes, so-called minor disputes and so-called major disputes. In both disputes, the parties are required to exert every effort to settle the dispute between themselves, but in the event the dispute remains unresolved after such efforts, in the case of a minor dispute it goes to the National Railroad Adjustment Board (Section 153, Title 45, U.S.C.A.), and after the procedures followed in the Act have been pursued, the National Adjustment Board will make an award which is binding on both parties. In the case of so-called major disputes remaining unresolved between the parties, either party may request the service of the Mediation Board (Section 156, Title 45, U.S.C.A.) and the dispute then goes through the procedures set up by the Act. In this case the difference between major and minor disputes is important for several reasons. In case of a minor dispute, referred to and under the jurisdiction of the Adjustment Board, a strike can never be legal, the award of the Board being final and binding upon the parties, whereas in the case of a major dispute the Mediation Board makes no award and after the procedures set up in the Act have been followed, a strike may be legal. The plaintiff in this case started out following the procedures outlined for a major dispute, but then attempted to withdraw the Section 6 notices which it had served and although the Mediation Board did not close the file on the dispute, the plaintiff then brought the case before the Adjustment Board.

The difference between the so-called major and minor disputes was pointed out by the Supreme Court in Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 65 S. Ct. 1282, 89 L.Ed. 1886. The Supreme Court, 325 U.S. at page 723, 65 S.Ct. at page 1290, said:

"The first (major dispute) relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement *or where it is sought to change the terms of one,* and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

"The second class (minor dispute) however, contemplates the existence of a collective agreement already concluded or, *at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one.*"

It seems clear from the record in this case that the dispute between the parties arose out of the attempt by the plaintiff to secure the amendment of the existing agreements with the defendant Brotherhoods to permit either the handling of loading operations by main line crews or to reduce the personnel of the yard crews from five persons to three persons. This dispute comes within the above quoted definition of a major dispute. Certainly there is no dispute over the terms or meanings of the existing agreements, but rather an attempt to amend the terms of the existing agreements.

Involving as it did an attempt to amend the existing agreements, the dispute between the plaintiff Railway Company and the defendant Brotherhoods was a major dispute to be handled in accordance with Section 6 of the Railway Labor Act (Section 156, Title 45 U.S.C.A.). That section, after providing that notice be given by either the carrier or representatives of the employees on intended change in an agreement affecting rates of pay, rules or working conditions and for the arranging of conferences between the parties, further provides:

"In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

The plaintiff Railway Company, as pointed out, initiated proceedings under this Section by serving so-called Section 6 notices, seeking to modify or amend the existing agreements to permit the loading of Berkeley Pit ore from the new Berkeley Yard either by main line crews or with a three-man yard crew rather than a five-man yard crew. When no agreement was reached in the conference between the Railway Company and the Brotherhoods, the latter invoked the services of the Mediation Board under the Act, and a mediator was assigned to the case. Thereafter, when no agreement was reached after conferences between the mediator and the parties, the Railway Company attempted to withdraw the Section 6 notices. However, the Brotherhoods protested the withdrawal of the Section 6 notices and the Mediation Board remained in the case and a mediator assigned to the case was present in Anaconda, Montana, when the work in the new Berkeley Yard was taken away from the Brotherhoods and given to another craft, the Brotherhoods served their strike notice, and the temporary restraining order enjoining such strike was issued. As soon as the temporary restraining order was issued, the mediator assigned to the case left the scene, but the file in the matter before the Mediation Board remained open at the time of the hearing in this court.

In view of the above quoted provision of Section 6 of the Railway Labor Act, it is clear that the plaintiff railway company could not on its own have made

the change from a five-man crew to a three-man crew, as was done, without violating that provision of the Act, because at the time the change was made the matter was still before the Mediation Board and a mediator was at the scene attempting to settle the dispute.

■ However, the Railway Company takes the position that the matter of making the change was out of its hands; that the new Berkeley Yard was an industrial yard of The Anaconda Company, and that the latter company had sole control over which craft would do the loading and switching work in the new yard and how many men would be employed in doing that work. That position might be perfectly valid in a case where the concern owning the industrial yard was unrelated to the carrier, but it has no validity in this case. Here the evidence discloses that to all intents and purposes and in every way except as to form, The Anaconda Company and the plaintiff Railway Company constituted but a single entity in their dealings with the defendant Brotherhoods concerning the loading of ore in the new Berkeley Pit. The Anaconda Company completely controls the Butte, Anaconda & Pacific Railway Company; the same person in one capacity or the other made all the decisions involved in this dispute and those decisions were made with the ultimate good of The Anaconda Company in view, and without regard to the obligations imposed on the carrier by its collective agreements and by the Railway Labor Act. It is crystal clear from the evidence that had the Brotherhoods acceded to the demands of the carrier for changes in the collective agreements members of the defendant Brotherhoods in the employ of the plaintiff Butte, Anaconda & Pacific Railway Company would have been allowed to do the loading and switching work in the new Berkeley Yard.

13 Am.Jur., Sec. 7, page 16, has this to say concerning the disregarding of corporate entity:

"The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for purposes of convenience and to subserve the ends of justice. *The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, will be disregarded by the courts.* Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical, the corporate entity being disregarded where used as a cloak or cover for fraud or illegality."

Ballantine on Corporations, page 313–314, quoted in plaintiff's brief, has this to say concerning the subject:

"*But after all it comes down to a question either of agency or of good faith, honesty and fairness in the use of the corporate privilege for legitimate ends.* If a corporation is controlled by another and is manipulated by the parent for its own purposes and in its own interests to the prejudice of innocent third parties, or the public welfare, it may be necessary to hold the controlling party responsible."

A statement that is particularly appropriate to this case and applicable to the third issue mentioned at the beginning of this memorandum is found in the case of Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N.W. 1024, 60 L.R.A. 927, 108 Am.St.Rep. 716 as quoted in 13 Am.Jur., page 161, as follows:

"Where a corporation is proceeding in equity to assert rights of an equitable nature, or is seeking relief upon rules or principles of equity, the court of equity will not forget that the stockholders are the real and substantial beneficiaries of a recovery, and if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be enforced by the corporation in their behalf, and for their

advantage, the corporation will not be permitted to recover."

By this memorandum the Court does not mean to infer that there is any fraudulent or illegal purpose in the ownership and control of the Butte, Anaconda & Pacific Railway Company by The Anaconda Company. On the contrary, it is a perfectly legitimate arrangement, which no doubt contributes generally to the welfare of both corporations and to the welfare of the community generally. All that is meant to be said is that such ownership and control of the Railway Company in this case was used to accomplish by indirection an end which the plaintiff Railway Company could not accomplish directly without violating the Railway Labor Act. Under such circumstances, this Court, sitting as a court of equity, will not lend its weight to such purpose by making permanent the temporary restraining order heretofore issued.