CHICAGO & NORTH WESTERN RAIL-
WAY COMPANY, a corporation,
Plaintiff-Appellee,

v.

ORDER OF RAILROAD TELEGRA-
PHERS, a voluntary association,
et al., Defendants-Appellants.

CHICAGO & NORTH WESTERN RAIL-
WAY COMPANY, a corporation,
Plaintiff-Appellant,

v.

ORDER OF RAILROAD TELEGRA-
PHERS, a voluntary association,
et al., Defendants-Appellees.

Nos. 12435, 12455.

United States Court of Appeals
Seventh Circuit.

March 13, 1959.

Alex Elson, Chicago, Ill., Lester P. Schoene, Washington, D. C., Aaron S. Wolff, Chicago, Ill., Schoene & Kramer, Washington, D. C., of counsel, for Order of Railroad Telegraphers.

Carl McGowan, Edgar Vanneman, Jr., Jordan Jay Hillman, Chicago, Ill., Roland D. Whitman, Ross, McGowan & O'Keefe, Chicago, Ill., of counsel, for Chicago & N. W. R. Co.

Charles H. Weston, Department of Justice, Washington, D. C., Victor R. Hansen, Asst. Atty. Gen., Kenneth F. Burgess, Chicago, Ill., Herman L. Bode, Asst. Atty. Gen., Pierre, S. D., Howard Neitzert, Walter J. Cummings, Jr., Robert Diller, William K. Bachelder, Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, amici curiæ.

Before DUFFY, Chief Judge, and PARKINSON and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

These two appeals arise out of the same proceeding below, and, by agreement of the parties, were heard together by this Court. In No. 12435, the defendants-appellants, hereinafter referred to as the "Union", have appealed from an

order of the District Court entered on August 20, 1958, restraining the Union from striking; the orders of August 22 and 27, 1958, extending the restraining order of August 20, 1958; that portion of the decree entered September 8, 1958, restraining the defendants from striking until midnight, September 19, 1958; and the order of September 16, 1958, entered pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A., restraining any strike pending appeal. In No. 12455, the plaintiff-appellant, hereinafter referred to as "North Western", has appealed from that portion of the September 8, 1958 decree denying any injunctive relief beyond September 19, 1958, and dismissing its complaint.

The contested issues are set forth with many variations by the parties. However, our decision that North Western is entitled to a permanent injunction is dispositive of the entire matter. The controlling issue may be stated simply as follows:

> May the employees of North Western, represented by the Union, lawfully strike to enforce a demand that positions held by such employees on December 3, 1957, shall be abolished only by agreement between North Western and the Union?

The facts are that North Western's stations, laid out a short distance apart many years ago to accommodate the horse-drawn vehicles of that day, have been so affected by the changes in transportation, including the hard roads, telephone and automobile, that many station agents were receiving a full day's pay for twelve to thirty minutes' work, although North Western was in serious need of funds to raise its service and equipment to a level at which it could compete not only with other railroads but with all other modern forms of transportation.

As a part of a modernization program to meet competition, North Western formulated its "Central Agency Plan", under which the service area of certain station agents was extended to include a neighboring station or stations without any curtailment of service to shippers.

North Western filed petitions for authority to effectuate the Central Agency Plan with the public utilities commissions of South Dakota, Iowa, Minnesota and Wisconsin. In South Dakota, the Public Utilities Commission held hearings at various points throughout the State over a period of about two months. The Union appeared in the proceedings to protest the granting of the authority sought; presented evidence; participated in filing briefs with, and in oral argument before, the Commission. The Commission found that the Central Agency Plan was required in the public interest, granted North Western the authority sought, and directed the Plan be made effective forthwith. The same procedure was followed in Iowa with a similar authorization granted by the Iowa State Commerce Commission. Hearings have been held before the Minnesota and Wisconsin Commissions, but determinations are still awaited.

In the Commission proceedings, the Union took the position that the Central Agency Plan could not be put into effect without agreement of the Union under the existing collective bargaining contracts. However, a few weeks after North Western filed its first petition in South Dakota, the Union sent North Western letters under Section 6 of the Railway Labor Act (45 U.S.C.A. § 151 et seq.) requesting that the existing collective bargaining agreements be amended by adding the following provision:

> "No position in existence on December 3, 1957, will be abolished or discontinued except by agreement between the Carrier and the Organization."

North Western informed the Union that it did not consider this proposal for a change in the contracts to be legally within the scope of Sec. 6 of the Railway Labor Act. Thereafter the Union invoked mediation under the Act. The National Mediation Board began mediation proceedings. The Board, on May 27,

1958, requested the parties to arbitrate. On May 28, 1958, the Union declined, and, on June 12, 1958, North Western declined. On June 16, 1958, the Board closed its files.

The Board Chairman and Chief Executive Officer of North Western indicated a willingness to discuss means of cushioning the economic impact of abolition of positions, as had been undertaken in a supplemental Unemployment Benefits Agreement with most of the other non-operating railroad unions who had been affected by reductions in force. North Western's Chairman expressed a continuing willingness to discuss that type of agreement, including such matters as severance pay, transition of employees from non-productive to productive employment and the like. The Union's President expressed an opinion that the Agreement was inadequate, but offered no proposals for alteration in its terms. The Union offered no modification or reduction in its proposed change to the existing contract.

North Western received notice, on August 14, 1958, of a threatened strike by the Union from the National Mediation Board. The Board offered its mediation services in the dispute. Both parties accepted and the case was docketed.

On August 18, 1958, the Union issued a strike call to its members for 6 o'clock A.M. on August 21, 1958, which read in part:

"The Issues.

"On July 10, 1957, we submitted to the membership on the Chicago & North Western System a strike ballot seeking the views of the membership as to whether a strike should be authorized if necessary to secure a satisfactory settlement of the dispute arising from our proposal to add to existing agreements the following rule:

" 'No position in existence on December 3, 1957, will be abolished or discontinued except by agreement between the Carrier and the Organization.'

"In the circular we summarized the circumstances giving rise to the urgent need for such a rule. We pointed out the general onslaught of this Carrier on the employment of the people we represent, and particularly the system-wide, wholesale elimination of agency positions and enlargement of assignments of the remaining agents. We recited the brutal conduct of the carrier in South Dakota in abolishing 53 positions and enlarging the assignments of 16 others, all in one day, before we even had notice of the Order of the South Dakota Commission under which the Carrier purported to act. We also told you of our strenuous, patient, but futile efforts to correct the situation under the Railway Labor Act and in the Courts.

"The need for the proposed rule has again been tragically demonstrated in the last few days. What happened in South Dakota was repeated in Iowa, except that this time 70 positions were abolished and 27 assignments enlarged.

"The vote on the strike ballot was almost unanimous in favor of a strike. The time has come to act in accordance with that vote."

On August 19, 1958, Mediator Wallace Rupp came to North Western. He talked with North Western's Director of Personnel. The latter suggested that, without prejudice to North Western's position regarding the illegality of the proposed contract change, " * * * there was a possibility of settling the entire question involving the proposed rule on the railroad by working out an arrangement for limiting the number of lay-offs per year to an agreed upon percentage of the total number of jobs of the [Union], over and above the reduction in the number of such employees by attrition." Rupp left to talk with representatives of the Union with the understanding that if they were interested in the Director's proposal, he would call him the following morning. Rupp did not call. The Board closed its

file on August 20, 1958, stating its services continued available if desired.

North Western then filed this action in injunction. The District Court issued a temporary restraining order which was continued through the hearing on the merits. On September 8, 1958, after hearing the evidence and arguments of counsel, the District Court filed findings of fact and conclusions of law, and entered a decree enjoining the Union from striking until midnight, September 19, 1958, and otherwise dismissing the complaint. The District Court then entered an order restraining the Union from striking pending appeal. These appeals followed.

The Norris-LaGuardia Act, (29 U.S.C.A. § 101 et seq.) prohibits any court of the United States from issuing an injunction in any case involving a "labor dispute", and in Sec. 113(c), the term "labor dispute" is defined as "any controversy concerning terms or conditions of employment".

■ The Railway Labor Act (45 U.S.C.A. § 151 et seq.) provides for a thirty-day written notice (Sec. 156) to be given by any party who wishes to change an agreement "affecting rates of pay, rules, or working conditions." This is commonly known as the "Section 6 Notice". Thus where a Section 6 Notice dealing with one of the enumerated subjects is given by a union to a carrier, a "labor dispute" within the meaning of the Norris-LaGuardia Act has arisen. Conversely, where the Section 6 Notice does not pertain to "rates of pay, rules, or working conditions", there is no "labor dispute", and the provisions of the Norris-LaGuardia Act with reference to injunctions are not applicable.

■ It is perhaps true that any demand a union might make, no matter how frivolous or unlawful, could, by some stretch of the imagination, be contended to affect "rates of pay, rules, or working conditions". However, the Supreme Court has pointed out that not all demands, by either labor or management, are within the scope of the Railway Labor Act, and hence the insistence upon their inclusion within a labor agreement does not give rise to a "labor dispute". Or, as it is more commonly put, the demand is not within the scope of mandatory bargaining. National Labor Relations Board v. Wooster Division of Borg-Warner Corp., 1957, 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823. Accordingly, the issue here is whether the Union's demand falls within the scope of mandatory bargaining. If it does not, the injunction may and should issue.

■ Certainly the Railway Labor Act does not divest a carrier of the right to manage and control the administrative functions of its business enterprise and conduct its business operations without exercise of a veto power by the Union. Here the Union is demanding such veto power over the abolition of any position in existence on December 3, 1957. The Union is thus attempting to attain, through the collective bargaining processes of the Railway Labor Act, that which would prohibit North Western from complying with the orders of the South Dakota Public Utilities Commission and the Iowa State Commerce Commission.

In short, this is an attempt by the Union to arrogate to itself the prerogatives that have been traditionally and rightfully management's, while, at the same time, assuming none of the corresponding burdens and responsibilities.

North Western must, as the record clearly shows, adapt itself to ever-changing technological developments, and must be ready, at all times, to meet the demands of competition in all fields of transportation by every legitimate means.

It appears clear that the effect of the Union's proposal, if accepted, would place in its hands the power to prevent any undertaking by North Western to meet competition by modernizing its operations in the light of technological development, and fulfilling its obligation of operating efficiently and economically for the benefit of itself, its employees, and

the public. Ultimately the Union could even bring about a situation where the railroad itself might be forced out of business or so crippled financially that all employees, including the Union's members, would suffer. This contract proposal, if accepted, would enable the Union to control the pace of North Western's compliance with the Commission orders aforesaid. The Union points to existing contracts in the railroad industry relating to stabilization of employment. These are described as dealing with severance allowance, supplementary unemployment compensation benefits and guaranteed employment.

They do not vest indefinite retroactive veto power over abolition of positions and are expressly limited to prospective periods of short duration. The existing agreement between North Western and the Union states no expiration date and may be changed only by mutual agreement. North Western asserts that it " \* \* \* remains ready to negotiate on any proposals comprehending financial benefits for job displacement or for otherwise cushioning the impact of the Central Agency Plan. It cannot agree to recognize the propriety of a separate demand which would displace Congress, the Interstate Commerce Commission, state regulatory commissions, and management, from the determination of the positions which must be maintained by the carrier from the standpoint of efficiency and economy."

■ In any event, the fact that other carriers may have submitted to unlawful demands does not change the character of such demands. A carrier may not escape its obligations by bargaining them away. The Commission orders may not be circumvented by a contract entered into by a carrier and a union under threat of strike.

In Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283, where the Supreme Court found that the dispute, as here, involved the validity of the contract, the Court concluded that the District Court had jurisdiction and power to issue necessary injunctive orders notwithstanding the provisions of the Norris-LaGuardia Act. 343 U.S. at page 774, 72 S.Ct. at page 1025.

In that case, by threat of strike, an exclusively "white" union secured a contract with a railway company not to permit negroes (hired as "train porters" because not eligible to join the contracting union) to perform duties of brakemen, as a result of which the railway company took steps to discharge the negro "train porters" who had been performing the duties of brakemen in order to replace them with members of the contracting "white" union.

To the same effect were Graham v. Brotherhood of Locomotive Firemen and Enginemen, 1949, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Steele v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; and Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187.

The Union attempts to distinguish these cases as involving a demand to bargain a patently immoral and unlawful contract provision. The provision here proposed is characterized by the Union as relating to stabilization of employment —a lawful purpose. However, "stabilization of employment" is a broad term which may, with equal justice, be applied to the aims of the unions concerned in the above cited cases. We see no material difference between the Howard case and the case before us.

The proposed contract change in the case before us represents an attempt to usurp legitimate managerial prerogative in the exercise of business judgment with respect to the most economical and efficient conduct of its operations. It is perhaps significant that on oral argument, counsel for the Union expressed the opinion that a demand for veto over discontinuing trains, while less reasonable than that proposed here, would constitute a bargainable issue under the Railway Labor Act.

■ The Court of Appeals for the Sixth Circuit was faced with an issue

similar to the one before this Court in Brotherhood of Railroad Trainmen v. New York Central Railroad Co., 6 Cir., 1957, 246 F.2d 114, certiorari denied 355 U.S. 877, 78 S.Ct. 140, 2 L.Ed.2d 107. There the union threatened to strike if the New York Central Railroad closed its Toledo, Ohio yards. The Court held that no labor dispute existed within the meaning of the Norris-LaGuardia Act and that the injunction should issue. While it is true that the union in that case gave no Section 6 Notice, we fail to see how such failure distinguishes the rationale of that case from the one here. We agree with the Sixth Circuit, which held (246 F.2d at page 122):

"A railroad strike involving a controversy which does not constitute a labor dispute, may be, and properly is, enjoined upon a showing that it will interfere with interstate commerce and result in irreparable injury to the public and to the railroad."

█ We, therefore, hold that such a demand as here made by the Union is completely outside the ambit of "rates of pay, rules or working conditions", as those words are used in the Railway Labor Act, In re Chicago North Shore & M. R. Co., 7 Cir., 1945, 147 F.2d 723, 727, certiorari denied Brotherhood of Locomotive Firemen and Enginemen v. Chicago, N. S. & M. R. Co., 325 U.S. 852, 65 S.Ct. 1089, 89 L.Ed. 1973, and hence is not within the scope of mandatory bargaining. Therefore, the terms of the Norris-LaGuardia Act are here inapplicable.

The District Court's finding that the proposed contract change related to "rates of pay, rules, or working conditions," and was thus a bargainable issue under the Railway Labor Act, is clearly erroneous.

The judgment of the District Court denying injunctive relief beyond September 19, 1958, and dismissing the complaint is reversed and cause remanded for entry of a permanent injunction as prayed by North Western.