54

BUTTE, ANACONDA & PACIFIC RAIL-
WAY COMPANY, a corporation,
Appellant,

v.

BROTHERHOOD OF LOCOMOTIVE
FIREMEN AND ENGINEMEN, a vol-
untary labor association; Frank W.
Glass, individually and as Vice Presi-
dent of the Brotherhood of Locomotive
Firemen and Enginemen; J. H. Mc-
Carvel, individually and as General
Chairman of the Brotherhood of Loco-
motive Firemen and Enginemen; Broth-
erhood of Railroad Trainmen, a volun-
tary labor association; H. E. Nevala, in-
dividually and as Deputy President of
the Brotherhood of Railroad Trainmen;
and R. R. McLean, individually and as
General Chairman of the Brotherhood
of Railroad Trainmen, Appellees.

No. 16372.

United States Court of Appeals
Ninth Circuit.

May 18, 1959.

R. Lewis Brown, Jr., J. B. Woodlief, P. L. MacDonald, W. M. Kirkpatrick, Butte, Mont., for appellant.

David L. Holland, E. J. Foley, Butte, Mont., Harold C. Heiss, Cleveland, Ohio, for appellees.

Nathan Witt, New York City, amicus curiæ for International Union of Mine, Mill & Smelter Workers, and Locals Nos. 1, 16, and 17 of said International.

Before BARNES, HAMLEY, and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

This action was brought by Butte, Anaconda & Pacific Railway Company to enjoin defendant Brotherhoods from calling a strike. The district court after hearing entered a judgment dismissing the action. The court's findings of fact, conclusions of law, and supporting opinion are reported in 168 F.Supp. 911. Plaintiff appeals.[1]

The principal questions presented here involve aspects of the Railway Labor Act, 45 U.S.C.A. § 151 et seq. They are: (1) Whether the controversy was a major or minor dispute under that act; (2) whether the dispute and resultant mediation proceedings had been terminated; and (3) whether during the pendency of the mediation proceedings appellant failed to preserve the status quo, as required by section 6 of the act, 45 U.S.C.A. § 156.

Appellant operates a railroad in Montana, hauling freight as a common carrier engaged in interstate commerce. It is a wholly-owned subsidiary of Anaconda, and both corporations are managed by the same staff of officers from president down to secretary-treasurer. All major policy decisions are made for appellant by officers who are also officers of Anaconda. In making such decisions the controlling consideration is the ultimate effect which the decisions will have on the profits earned by Anaconda.

Anaconda owns and, since 1956, has operated an open pit copper mine at Butte, Montana, known as the Berkeley Pit. Prior to March 14, 1958, the ore from this pit was loaded in appellant's ore cars at a loading yard known as the old Berkeley Yard. The work of switching ore cars in the old Berkeley Yard and between that yard and the West Butte Yard was performed by yard crews of appellant. The men in these crews were members of appellee Brotherhoods, and performed such work pursuant to agreements between the railroad and the Brotherhoods. Under these agreements each yard crew which performed switching service consisted of five men.

Prior to March 14, 1958, a new loading and switching yard, commonly referred to as the new Berkeley Yard, was constructed for Anaconda to serve the Berkeley Pit. Anaconda ascertained that its employees, represented by International Union, were willing to do the switching at the new Berkeley Yard on a three-man-crew basis. It therefore decided to

1. Attorneys for The Anaconda Company (Anaconda), International Union of Mine, Mill & Smelter Workers (International Union), and Locals Nos. 1, 16, and 17 of that union, were permitted to appear before this court as amici curiae.

do its own switching when the new Berkeley Yard was put in operation. However, the then manager of appellant obtained permission from Anaconda to explore the possibility of having the switching done by the railroad's employees on as economical a basis as it could be done by Anaconda. If this were found to be possible, then Anaconda would continue to contract this switching to appellant as it was then doing at the old Berkeley Yard.

With this purpose in mind, appellant on September 27, 1957, served upon appellee Brotherhoods a so-called section 6 notice under the Railway Labor Act.[2] In this notice appellant proposed an amendment of the existing agreements between it and the Brotherhoods to permit the loading of ore in the new Berkeley Yard with main line crews instead of yard crews. Appellee Brotherhoods rejected this proposal. Appellant then served another section 6 notice in which it was proposed that the existing agreements be amended to provide that the yard crews in the new Berkeley Yard consist of three men rather than five men.

Appellee Brotherhoods declined to agree to such an amendment. On October 25, 1957, they invoked the mediation services of the National Mediation Board. The Board docketed this dispute as Mediation Case No. A-5623. A mediator was assigned to the case by the Board and a conference of the parties under the sponsorship of the mediator was held on January 15, 1958. The Brotherhoods there indicated their continued unwillingness to accept either of the contract amendments proposed by appellant. The railroad then informed the Brotherhoods that when the new Berkeley Yard was put into operation the switching would be done by employees of Anaconda.

On January 17, 1958, appellant notified the mediator and the Brotherhoods that it was withdrawing the section 6 notices, with the intention thereby of terminating the mediation proceedings. The Brotherhoods, however, took the position that in view of appellant's announcement that Anaconda would do the switching at the new Berkeley Yard a dispute necessitating mediation continued. The Board decided to resume active mediation and advised the parties that conferences would begin on March 5, 1958. No progress was made at these conferences.

On March 7, 1958, appellant advised the Brotherhoods that the loading of ore cars in the new Berkeley Yard would commence shortly. The Brotherhoods were further advised that appellant did not consider the "status quo" provision of the Railway Labor Act as applicable to the contemplated discontinuance of switching service by appellant.[3]

Under the plan for service in and to the new Berkeley Yard developed by appellant and Anaconda, appellant's trains would use Northern Pacific Railroad Company tracks between Durant, Montana, and the new yard. Seeking to take

2. Section 6 of the act, 45 U.S.C.A. § 156, reads as follows:

"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

3. The so-called "status quo" provision is contained in the second sentence of section 6, quoted in footnote 2.

advantage of this fact as a basis for bargaining, the Brotherhoods on March 8, 1958, submitted to appellant a proposed agreement. Under this proposal appellant would be required to pay substantial additional compensation to its railroad employees because of its use of Northern Pacific tracks. It was proposed that the agreement would become effective when Anaconda employees took over the switching at the new Berkeley Yard. It would continue until such switching was returned to appellant's employees represented by the Brotherhoods.[4] Neither the Brotherhoods nor appellant gave a section 6 notice in connection with this proposed agreement.

Appellant apparently rejected the proposed agreement. On March 11, 1958, the Brotherhoods notified appellant that the latter's employees represented by the Brotherhoods would strike on March 14, 1958.[5] On March 13, 1958, appellant sent a telegram to the National Railroad Adjustment Board calling attention to the Brotherhoods' proposal of March 8, 1958. Asserting that the latter were seeking "to impose severe penalties upon carrier," appellant asked the Adjustment Board to "accept jurisdiction and docket." On the following day the Adjustment Board advised appellant by telegram that jurisdiction could not be accepted on the basis of appellant's telegram. It would be necessary, appellant was advised, to submit the matter "in accordance with circulars one B and C." The record does not indicate that appellant thereafter perfected its submission of this matter to the Adjustment Board.[6]

On March 13, 1958, which was the same day that appellant sent its telegram to the Adjustment Board, appellant instituted this action for injunctive relief. The suit was commenced in the District Court of the Second Judicial District of Montana, in and for the County of Silver Bow. A temporary restraining order was immediately issued by the state court enjoining the Brotherhoods from carrying out their strike threat. Upon being advised of this development, the mediator ceased his efforts at mediation. However, the files in the matter before the Mediation Board remained open.

The cause was thereafter removed to the United States District Court, District of Montana, Butte Division, because of the presence of a federal question. See 28 U.S.C.A. § 1331.

In dismissing the action the district court held in effect that (1) the dispute which led to the strike threat was a "major dispute" within the meaning of the Railway Labor Act and as such had been submitted to the National Mediation Board under section 6 of that act (45 U.S.C.A. § 156); (2) appellant could not legally have reduced the number of employees per switching crew from five to three while the section 6 procedure was pending, in view of the status quo provision of that section; (3) the status quo provision was circumvented and there was accomplished indirectly what could not be accomplished directly by the act of the parent corporation, Anaconda, in taking over the switching work and employing its own employees on a three-man-crew basis; and (4) a court of equity "will not lend its weight to such purpose by making permanent the temporary restraining order heretofore issued."[7] [168 F.Supp. 919.]

4. It is recited in this proposed agreement that the agreement does not dispose of, set aside, or prejudice the position of the Brotherhoods that appellant was not entitled to turn over the switching work at the new Berkeley Yard to Anaconda.

5. The reasons given in this strike notice were " * * * the carrier's refusal to negotiate matters in dispute over change of operations and, failing to hold matters

which are in dispute, status quo, pending mediation proceedings."

6. In June 1958, following the commencement of this action, appellant submitted to the Adjustment Board certain time claims filed by the Brotherhoods, none of which brought into question the dispute which led to the strike threat.

7. The judgment of the district court here under review dissolved the temporary

Appellant contends that although a section 6 "major dispute" had been in existence it came to an end when the Brotherhoods rejected appellant's proposal, the latter withdrew its section 6 notices, and Anaconda took over the switching operation. Thereafter, appellant argues, any controversy that remained was either a so-called "minor dispute" concerning which a strike is unlawful, or was no labor dispute at all, thus escaping the sanctions of the Norris-LaGuardia Act.[8] In the latter event, or even if the controversy be regarded as a major dispute, appellant urges, injunctive relief should have been granted. The district court's view that such relief should be denied because appellant did not preserve the status quo is challenged. According to appellant, such a conclusion is possible only if the corporate identity of Anaconda is ignored, and this should not be done.

■ At the outset it is necessary to note the distinction between so-called major and minor disputes under the Railway Labor Act. In Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886, the difference between these two kinds of dispute was explained as follows:

"The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

"The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement. * * * * "

As to both kinds of dispute, the act requires that the parties enter into negotiation as the first step towards settlement of the controversy. Where negotiation fails, the procedures diverge. Major disputes go first to mediation before the National Mediation Board; if that fails, then to acceptance or rejection of arbitration; and finally to possible presidential intervention. If all this fails, compulsory processes are at an end, and either party may resort to self-help. Elgin, Joliet & Eastern Railway Co. v. Burley, supra, 325 U.S. at page 725, 65 S.Ct. at page 1290. The Norris-LaGuardia Act prohibits the issuance of an injunction in a railway labor case involving a "major dispute." Brotherhood of Railroad

restraining order and, as before noted, dismissed the action. This court initially enjoined the strike pending disposition of the appeal, subject to certain conditions. The conditions were not fulfilled, and on March 31, 1959, the injunction was dissolved, effective April 6, 1959. No injunction has been in effect since the latter date. We are advised that no strike has been called since dissolution of the injunction. This may be due to the pendency of an action in the District Court of the Second Judicial District of Montana in and for the County of Silver Bow. In the latter action, commenced on April 3, 1959, the International Union and one of its locals seek to enjoin Anaconda from returning the switching work at the new Berkeley Yard to railroad employees represented by the Brotherhoods. A temporary restraining order has been granted in that state action. Appellee Brotherhoods have applied to this court for a writ of prohibition to bring these state court proceedings to a halt pending disposition of this appeal. Brotherhood of Locomotive Firemen and Enginemen v. The Anaconda Company No. 16437.

8. 47 Stat. 70, as amended, 29 U.S.C.A. §§ 101–115.

Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 42, 77 S.Ct. 635, 1 L.Ed.2d 622.

In the case of minor disputes, if negotiation fails either party may submit the matter to the appropriate division of the National Railroad Adjustment Board. The awards of the several divisions of the Adjustment Board are final and binding. Neither party is permitted to resort to self-help. A strike involving a so-called minor dispute is therefore to be enjoined. Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., supra.

As before noted, appellant concedes that a section 6 major dispute was at one time in existence between these parties. Regardless of the concession, however, there could be no question as to this, since appellant itself gave the section 6 notices. The dispute, which was later submitted to mediation, related to "working conditions," i. e., whether a road crew or a yard crew should do certain switching, and, if a yard crew, how many men would be in the crew. Appellant specifically requested a change in existing agreements concerning these matters. No question was involved as to the interpretation of existing agreements.

Appellant contends, however, that the major dispute involving these matters came to an end when the Brotherhoods rejected appellant's proposals, the latter withdrew its section 6 notices, and Anaconda took over the switching operations at the new Berkeley Yard.

The action of the Brotherhoods in rejecting appellant's proposals did not serve to terminate the mediation proceeding. Under section 5 of the act, 45 U.S.C.A. § 155, several other steps remained to be taken.[9] Likewise, the action of appellant in withdrawing its section 6 notices did not terminate the proceeding. The provisions of section 5 referred to in footnote 9 make it clear that the parties to a dispute under mediation may not unilaterally terminate the proceeding, but are required to follow each procedural step specified in the statute.

If the major dispute was terminated, therefore, it must have been for the reason that after the Brotherhoods rejected appellant's proposals Anaconda took over the switching operation at the new Berkeley Yard. Appellant asserts that when this occurred the subject matter of the dispute disappeared. Since employees represented by the Brotherhoods would not be doing the switching, the argument goes, any question of changing the Brotherhood agreements with regard to such switching operations was rendered moot.

It may be assumed, for present purposes, that where an independent shipper, not acting in concert with a carrier, determines to perform its own switching service on its own property, section 6 mediation proceedings involving a dispute relative to such service are necessarily terminated.

Here, however, the carrier is the wholly-owned subsidiary of the shipper—Anaconda. The two have common principal officers and the unified purpose of serving the ultimate best interests of the shipper. Under these circumstances the act of Anaconda in taking over the switching service, to be performed by employees represented by another union, must be regarded as the act of the carrier. Otherwise, a carrier by interrelation with its shippers would always have

9. The next step was for the Mediation Board to endeavor to induce the parties to submit their controversy to arbitration. If either party had refused to arbitrate, the Board would then have been required to notify the parties in writing that its mediatory efforts had failed. After this had been done, no change could have been made in the rate of pay, rules, working conditions, or established practices for a period of thirty days unless in the intervening period the parties had agreed to arbitration, or an emergency board had been created under section 10, 45 U.S.C.A. § 160.

it within its power to circumvent the mediation provision of the Railway Labor Act.

The circumstances of this case are particularly aggravated. With the necessary acquiescence, if not upon the direction, of its parent corporation, appellant gave the section 6 notices. The Brotherhoods and the Mediation Board were entitled to assume that this was a bona fide attempt to invoke the provisions of the act relating to major disputes. As events turned out, it was not, since appellant was not content or able to participate in the proceedings as an independent carrier. On the contrary, it always had it within its power, or so it thought, to terminate the proceeding through action by Anaconda.

We therefore conclude that the major dispute between appellant and the Brotherhoods concerning contract provisions applicable to switching at the new Berkeley Yard still exists. Likewise, the mediation proceedings instituted by appellant in an effort to resolve that dispute are still pending.

■ Appellant argues that even if this is so, the injunction should have been granted. This contention is based on the premise that the dispute is something different from what it started out to be. Appellant asserts that the dispute which now exists is whether the men represented by appellees are to be allowed to do the work at all.

But this view must necessarily be rejected in the light of what has already been said. The nature of the dispute has not been changed unless the action of Anaconda in taking over the switching operation can be regarded as that of an independent shipper not acting in concert with its carrier. It has been shown that this is not the case and that what Anaconda has done must be regarded as

the act of the carrier. The dispute thus remains the same as when the section 6 notices were given.

On similar reasoning we agree with the conclusion of the district court that appellant has not maintained the status quo pending completion of the mediation proceedings, as required by section 6 of the act. This alone is enough to warrant dismissal of appellant's action for injunctive relief unless the decree sought to be entered would also require restoration of the status quo. Neither party has asked for the latter relief.

■ Injunctive relief may be utilized by either party to vindicate the processes of the Railway Labor Act. Virginia R. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789. But here appellant does not seek an injunction to compel utilization of Railway Labor Act procedures. Rather it wants to enjoin employees from resorting to self-help after appellant itself (through Anaconda) abandoned those procedures. In addition to the reasons given by the district court for denying such relief, it was also necessarily denied for the reason that appellant had not exhausted its administrative remedies.[10]

Appellant also argues that the controversy is not a "labor dispute" within the meaning of the Norris-LaGuardia Act, and that the sanctions of that act are therefore inapplicable. Again, however, this contention is predicated upon the view that the initial dispute came to an end when Anaconda decided to take over the switching operation at the new Berkeley Yard. This, as we have decided, is not true.

There are certain decisions which a carrier may make which cannot give rise to "labor disputes" within the meaning

10. Section 8 of the Norris-LaGuardia Act, footnote 8, supra, 29 U.S.C.A. § 108. It may be noted that if this had been found to be a minor dispute instead of a major dispute an injunction could not have been obtained, because the dispute was not submitted to the National Railroad Adjustment Board. See Manion v. Kansas City Terminal Railway Co., 353 U.S. 927, 77 S.Ct. 706, 1 L.Ed.2d 722.

of the Norris-LaGuardia Act.[11] But we have concluded that the controversy which resulted in the strike threat in the matter before us was a major dispute within the meaning of the Railway Labor Act. It was therefore a "labor dispute" within the meaning of the Norris-La-Guardia Act. In any event, the latter act stands in the way of granting injunctions under certain circumstances. It provides no basis for the granting of an injunction.

Affirmed.

11. See Brotherhood of Railroad Trainmen v. New York Central Railroad Co., 6 Cir., 246 F.2d 114; Chicago & North Western Railway Co. v. Order of Railroad Telegraphers, 7 Cir., 264 F.2d 254.