FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AIRCRAFT SERVICE INTERNATIONAL, INC., *Plaintiff-Appellee*, v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO, LOCAL 117, *Defendant*, and WORKING WASHINGTON; ALEX POPESCU; JONATHAN ROSENBLUM, *Defendants-Appellants*. | No. 12-36026 D.C. No. 2:12-cv-01729-JLR OPINION |

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted En Banc
September 18, 2014—San Francisco, California

Filed March 10, 2015

Before: Alex Kozinski, Diarmuid F. O'Scannlain, Andrew
J. Kleinfeld, Barry G. Silverman, Susan P. Graber, Richard
A. Paez, Marsha S. Berzon, Richard C. Tallman, Andrew

D. Hurwitz, John B. Owens, and Michelle T. Friedland,
Circuit Judges.

Opinion by Judge Owens;
Concurrence by Judge Berzon;
Dissent by Judge Kleinfeld

## SUMMARY[*]

### Labor Law

The en banc court reversed and vacated the district court's preliminary injunction under the Railway Labor Act against a strike by aircraft fuelers at Seattle-Tacoma International Airport.

The en banc court held that the district court erred in failing to consider whether, prior to seeking a preliminary injunction, the fuelers' employer had made "every reasonable effort to settle [the labor] dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration," as required by Section 8 of the Norris-LaGuardia Act. In addition, the record lacked any evidence that the employer had done so. The en banc court held that the Railway Labor Act creates an exception to the Norris-LaGuardia Act, but this exception is limited and does not include Section 8.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring, Judge Berzon, joined by Judges Paez and Graber, agreed with the majority that the district court erred in granting an injunction, as the employer had not complied with its duty under Section 8 of the Norris-LaGuardia Act. Judge Berzon wrote to explain that, in her view, even if the employer had complied with its duty under Section 8, it still would not have been entitled to an injunction because the labor dispute was not governed by the dispute resolution provisions of the Railway Labor Act.

Dissenting, Judge Kleinfeld, joined by Judges O'Scannlain, Silverman, and Tallman, wrote that the district court's order should be affirmed because the strike was barred by the Railway Labor Act, and the jurisdiction-stripping provisions of the Norris-LaGuardia Act did not apply.

---

### COUNSEL

Dmitri Iglitzin, Schwerin Campbell Barnard Iglitzin & Lavitt, LLP, Seattle, Washington; David P. Dean (argued), Kathy L. Krieger, Darin M. Dalmat, and Ryan E. Griffin, James & Hoffman, P.C., Washington, D.C., for Defendants-Appellants.

Douglas W. Hall (argued), FordHarrison LLP, Washington, D.C., for Plaintiff-Appellee.

---

**OPINION**

OWENS, Circuit Judge:

Aircraft Service International, Inc., doing business as Aircraft Service International Group ("ASIG"), sought and obtained a preliminary injunction from the district court in October 2012 prohibiting ASIG's employees from striking at Seattle-Tacoma International Airport ("Sea-Tac"). Section 8 of the Norris-LaGuardia Act ("NLGA") strips district courts of jurisdiction to enter such an injunction unless the party seeking relief has made "every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. Because the district court failed to consider whether ASIG satisfied this provision and the record lacks any evidence that ASIG did so, we reverse and vacate the preliminary injunction.

## I.  FACTS AND PROCEDURAL HISTORY

ASIG is responsible for refueling about 75 percent of the airplanes at Sea-Tac. The dispute at issue arose when ASIG indefinitely suspended one of its fuelers, Alex Popescu, on September 14, 2012. Popescu and other ASIG fuelers allege that he was suspended "in retaliation for his leadership on workplace safety issues, including testifying at a public hearing of the Seattle Port Commission." ASIG counters that Popescu was suspended "so it could investigate reports that [he] had engaged in inappropriate conduct at the workplace."

After his suspension, Popescu and other ASIG fuelers decided to organize a "group response" to press for his reinstatement. Working Washington, a local coalition "united

in support of quality jobs and a fair economy," was heavily involved in this effort. Jonathan Rosenblum is Working Washington's "Campaign Director." After unsuccessfully advocating for Popescu's reinstatement for two weeks, and at Working Washington's recommendation, the fuelers began distributing strike ballots on September 28. "[B]y an overwhelming margin," the fuelers voted to approve a strike to "get Alex Popescu back to work and to protest retaliation and intimidation by ASIG." Working Washington held a press conference soon after to publicize the fuelers' vote. Two days after this press conference, ASIG filed a complaint in the Western District of Washington seeking to enjoin any anticipated strike. This chain of events is summarized as follows:

- September 14, 2012: ASIG suspends Popescu.

- September 17, 2012: Popescu meets with the local ASIG station manager to discuss reinstatement and investigatory process.

- September 25, 2012: Several ASIG fuelers allegedly call ASIG's Human Resources Department to ask for Popescu's reinstatement.

- September 28–30, 2012: Working Washington distributes and collects strike ballots.

- September 30, 2012: The strike ballots are counted.

- October 3, 2012: Working Washington holds a press conference publicizing the strike vote.

- October 5, 2012: ASIG files a complaint for injunctive and declaratory relief.

The district court issued a temporary restraining order on October 5, 2012, prohibiting the fuelers from engaging in any strike activity "or other concerted action which is intended to interfere with ASIG's operations." After a hearing, the district court issued the following preliminary injunction on October 18, 2012:

> Alex Popescu, Working Washington, Jonathan Rosenblum, and John Does 1–100, and their officers, agents, employees, and members are hereby preliminarily enjoined from in any manner or by any means directing, calling, causing, authorizing, inducing, instigating, conducting, continuing, encouraging, or engaging in any strike, work stoppage, sick-out, slow-down, work-to-rule campaign, or other concerted action in violation of the [Railway Labor Act] which is intended to interfere with ASI[G]'s normal operations.

(footnote omitted).

In granting this preliminary injunction, the district court assessed whether ASIG had satisfied the four prongs of the *Winter* test: (1) the moving party is likely to succeed on the merits; (2) irreparable harm is likely if the injunction is not granted; (3) the balance of equities tips in the moving party's favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Acknowledging that the "parties spen[t] very little time

briefing the other three criteria," the district court devoted the lion's share of its analysis to the first prong—in particular, Defendants' contention that the Railway Labor Act ("RLA") does not govern the dispute. The district court relied on both the RLA's stated purpose of avoiding interruptions to commerce and its prohibition on "strike-first tactics" in concluding that the Act prohibited Defendants' proposed strike.

The district court then addressed Defendants' argument that it had "no authority to issue an injunction because the NLGA forbids it from doing so." Citing *Burlington Northern Railroad v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429 (1987), and *Pittsburgh & Lake Erie Railroad v. Railway Labor Executives' Ass'n*, 491 U.S. 490 (1989), the district court concluded that the RLA trumped the NLGA. The district court entered the injunction without analyzing or citing Section 8 of the NLGA.

## II.  STANDARD OF REVIEW

"We review the legal determination of whether the district court had the power to issue an injunction de novo, but review the district court's exercise of that power for abuse of discretion." *Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1102 (9th Cir. 1994). "Abuse-of-discretion review is highly deferential to the district court," but "[w]hen a district court makes an error of law, it is an abuse of discretion." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012) (internal quotation marks omitted). We review all legal interpretations underlying an injunction de novo. *Id.*

### III.  DISCUSSION

The NLGA generally divests federal courts of jurisdiction to "issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of [the NLGA]."  29 U.S.C. § 101.  Two provisions of the NLGA are relevant to this case: Section 4 and Section 8. Under Section 4, "in any case involving or growing out of any labor dispute," federal courts are prohibited from issuing an injunction to prohibit any person from "[c]easing or refusing to perform any work," i.e., striking.  *Id.* § 104(a). Under Section 8, federal courts are prohibited from issuing injunctive relief to "any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."  *Id.* § 108. Section 8 is called the NLGA's "clean hands" provision. *Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, P. & W. R.R.*, 321 U.S. 50, 60 (1944) (quoting 75 Cong. Rec. 5464 (1932) (statement of Rep. John O'Connor)) (internal quotation marks omitted).

The parties do not dispute that this case involves a "labor dispute" for purposes of the NLGA.  Accordingly, the district court lacked jurisdiction to issue a preliminary injunction unless it could overcome the restrictions of Sections 4 and 8.

## A. Background of the Norris-LaGuardia Act and the Railway Labor Act

The Norris-LaGuardia Act was enacted to "tak[e] the federal courts out of the labor injunction business." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982) (emphasis omitted). Before its passage in 1932, "federal courts routinely enjoined labor picketing at the behest of employers." *Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174*, 203 F.3d 703, 707 (9th Cir. 2000) (en banc); *see Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Prods.*, 311 U.S. 91, 102 (1940) (citing congressional report that "approximately 300 [injunctions] were issued in connection with the railway shopmen's strike of 1922"). "This practice was derisively dubbed 'government by injunction.'" *Burlington N. Santa Fe Ry. Co.*, 203 F.3d at 707 (quoting *Milk Wagon Drivers' Union*, 311 U.S. at 102).

Seeking injunctive relief was popular among employers because of its "unique effectiveness in stifling labor disputes." *Id.* "[P]reliminary injunctions enabled employers to defeat unions instantly by preventing them from using self-help and destroying the momentum of strikes before substantive legal rights were litigated." *Id.*; *see also* Felix Frankfurter & Nathan Greene, *The Labor Injunction* 17 & n.71 (1930). Employers typically sought relief in federal courts because "federal judges tended to be more hostile to labor than state court judges." *Burlington N. Santa Fe Ry. Co.*, 203 F.3d at 708. Rather than attempt to amend the substantive law to remedy this "extraordinary problem," Congress felt compelled to take the "extraordinary step of divesting federal courts of equitable jurisdiction" over these disputes. *Burlington N. R.R. v. Bhd. of Maint. of Way*

*Employes*, 481 U.S. 429, 437 (1987). Thus was born the NLGA.

The Railway Labor Act was enacted with a different goal in mind: "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein." 45 U.S.C. § 151a. Passed in 1926, the RLA was intended to quell the persistent labor unrest that "threaten[ed] disruption of transportation." *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R.*, 353 U.S. 30, 40 (1957). Finding existing voluntary mechanisms inadequate, the major railroad carriers and unions came together to craft a mandatory system of dispute resolution. *Id.* The result was the RLA's "virtually endless" process of "negotiation, mediation, voluntary arbitration, and conciliation." *Burlington N. R.R.*, 481 U.S. at 444 (internal quotation marks omitted). The hope was that future labor disputes would be resolved through this process, and not through disruptive strikes. *See id.* at 451. Congress extended the "same benefits and obligations" of this process to the fledgling air transportation industry in 1936. *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682, 685 (1963); *see* 45 U.S.C. §§ 181–188.

## B. Interplay Between the Railway Labor Act and the Norris-LaGuardia Act

The relationship between the RLA—with its goal of keeping the trains and planes running—and the NLGA—with its goal of keeping federal courts out of the labor injunction business—has always been somewhat unclear. *See* 75 Cong. Rec. 5504 (1932) (statement of Rep. Fiorello LaGuardia) (inquiring about an apparent "tie-up" between the provisions of the RLA and the NLGA). Although Section 4 of the NLGA is phrased in absolute language, the Supreme Court

consistently has held that the "competing demands of the RLA and the Norris-LaGuardia Act" must be "accommodate[d]." *Burlington N. R.R.*, 481 U.S. at 445; *see also Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 772–73 (1961); *Graham v. Bhd. of Locomotive Firemen & Enginemen*, 338 U.S. 232, 239–40 (1949); *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 563 (1937). In practice, this means that the RLA has been read as creating an exception to the NLGA. Yet the boundaries of this exception are narrow. Although the "specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act," *Pittsburgh & Lake Erie R.R. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 490, 513 (1989) (internal quotation marks omitted), "[t]his exception is necessarily a limited one," *Burlington N. R.R.*, 481 U.S. at 446. In fact, "[e]ven when a violation of a specific mandate of the RLA is shown," courts should "hesitate" to grant an injunction "unless that remedy alone can effectively guard the plaintiff's right." *Id.* (quoting *Int'l Ass'n of Machinists*, 367 U.S. at 773) (internal quotation mark omitted).

The district court concluded that the RLA applied to this dispute, and that this meant that no provision of the NLGA could apply—thus allowing the district court to issue the preliminary injunction without considering whether Section 8 of the NLGA was satisfied. This blanket conclusion, however, elided the distinction between Sections 4 and 8 of the NLGA. Although the Supreme Court has "held that the *NLGA § 4* general limitation on district courts' power to issue injunctions in labor disputes must be accommodated to the more specific provisions of the RLA," *Pittsburgh & Lake*

*Erie R.R.*, 491 U.S. at 513 (emphasis added),[1] neither this court nor the Supreme Court has held that the same is true with respect to Section 8.

The vast majority of courts to consider this question have applied Section 8 to disputes that the RLA governs.[2] Indeed,

---

[1] This is not to suggest that the RLA applies to this dispute, in which ASIG's employees are non-unionized, or that Section 4 of the NLGA does not apply. We do not reach those intertwined questions. The dissent's reliance on the fuelers' obligations under Section 2, First of the RLA is thus misplaced. We assume, for the purposes of this opinion only, that this provision binds the fuelers—and that this obligation supersedes Section 4 of the NLGA.

[2] *See Grand Trunk W. R.R. v. Bhd. of Maint. of Way Emps. Div.*, 497 F.3d 568, 571–73 (6th Cir. 2007) (requiring that a carrier must satisfy Section 8 before obtaining an injunction under the RLA); *Nw. Airlines Corp. v. Ass'n of Flight Attendants–CWA* (*In re Nw. Airlines Corp.*), 483 F.3d 160, 166–67, 177 (2d Cir. 2007) ("While [the NLGA] generally admits of only limited exception, the Supreme Court has held that the NLGA does not preclude courts from enforcing the mandates of the RLA. Even so, however, a party seeking an injunction under the NLGA must have clean hands." (citation omitted)); *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 900–02 (7th Cir. 1986) ("In making its ruling, the district court correctly noted that any party seeking injunctive relief under the RLA must comply with section 8 of the Norris-LaGuardia Act." (citation omitted)); *Piedmont Aviation, Inc. v. Air Line Pilots Ass'n, Int'l*, 416 F.2d 633, 638–39 (4th Cir. 1969); *Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R.*, 385 F.2d 581, 613–14 (D.C. Cir. 1967) ("That principle of accommodation means that actions to enjoin violations of the Railway Labor Act may be maintained without regard to Section 4 of the Norris-La Guardia Act, and yet be subject to Section 8 of that Act."); *Consol. Rail Corp. v. Bhd. of Maint. of Way Emps.*, 735 F. Supp. 1265, 1268–70 (E.D. Pa. 1990); *E. Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 710 F. Supp. 1342, 1347 (S.D. Fla. 1989). *But see Bhd. of R.R. Trainmen v. Denver & Rio Grande W. R.R.*, 290 F.2d 266, 270 (10th Cir. 1961).

over the years our court has treated Sections 4 and 8 as independent limitations on a district court's power to issue an injunction, even when the RLA applied. *See, e.g.*, *Trans Int'l Airlines, Inc. v. Int'l Bhd. of Teamsters*, 650 F.2d 949, 957–58, 961–67 (9th Cir. 1980) (Kennedy, J.) (considering whether the "clean hands" requirement had been satisfied independently of analysis of whether the RLA trumped Section 4); *Switchmen's Union of N. Am. v. S. Pac. Co.*, 398 F.2d 443, 447 (9th Cir. 1968) (considering whether Section 8 had been satisfied after determining that the RLA trumped Section 4); *Order of Ry. Conductors & Brakemen v. Spokane, Portland & Seattle Ry. Co.*, 366 F.2d 99, 104–05 (9th Cir. 1966) (noting that, even if the RLA trumped Section 4, the Supreme Court's *Toledo* decision "foreclose[d] the railroad, which positively rejected mediation, from claiming an injunction"); *Butte, Anaconda & Pac. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 268 F.2d 54, 60 & n.10 (9th Cir. 1959) (noting that Section 8 would have barred injunctive relief even if the RLA had trumped Section 4); *see also Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs*, 307 F.2d 21, 39–40 (2d Cir. 1962) (relying in part on *Butte*

---

At least two other circuits have issued seemingly conflicting decisions with respect to this question. *Compare Ry. Express Agency, Inc. v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers*, 437 F.2d 388, 393–94 (5th Cir. 1971), *and Itasca Lodge 2029 v. Ry. Express Agency Inc.*, 391 F.2d 657, 667–69 (8th Cir. 1968), *with Atlanta & W. Point R.R. v. United Transp. Union*, 439 F.2d 73, 79–80 (5th Cir. 1971), *and Bhd. of R.R. Carmen of Am., Local No. 429 v. Chi. & N.W. Ry. Co.*, 354 F.2d 786, 794–96 (8th Cir. 1965).

for the proposition that, even if the RLA trumps Section 4, a party must comply with Section 8 to obtain injunctive relief).[3]

This approach to the relationship between the RLA and Section 8 is consistent with the Supreme Court's past efforts to "accommodate" the RLA and Section 4 of the NLGA.  As noted above, the RLA creates only a "limited" exception to Section 4—one restricted to situations in which an injunction is the only remedy that can safeguard a right that the RLA grants.  *Burlington N. R.R.*, 481 U.S. at 446; *see also Graham*, 338 U.S. at 239–40 (rejecting a construction of Section 4 that would leave federal courts "powerless to enforce" rights granted by the RLA); *Fed. Express Corp. v. Teamster Union, Local No. 85*, 617 F.2d 524, 526 (9th Cir. 1980) ("[W]hile federal courts may issue injunctions in labor disputes to compel the parties to fulfill their obligations under the RLA, when no such duties exist, the Norris-LaGuardia Act controls.").  For example, in *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad*, a union chose to strike rather than submit to the dispute resolution procedures of the RLA.  353 U.S. at 32–33.  If the Supreme Court had chosen to strictly enforce Section 4 in those circumstances, the railroad would have effectively been left with a right under the RLA without a remedy.  Accordingly, the Court instead permitted the injunction to stand despite Section 4 to prevent the specific provisions of the RLA from being rendered "nugatory."  *See id.* at 40–42 (quoting *Virginian Ry. Co.*, 300 U.S. at 563).  Only in such a case of "irreconcilable conflict between" the RLA and the NLGA is

---

[3] We also have recognized that Section 4 of the NLGA is conceptually distinct from Section 8 in other contexts.  *See Camping Constr. Co. v. Dist. Council of Iron Workers*, 915 F.2d 1333, 1348 (9th Cir. 1990).

it necessary to choose between the RLA and the NLGA.  *See Chi. & N.W. Ry. Co.*, 402 U.S. at 582 n.18.

Section 8, however, does not conflict with any provision of the RLA.  On the contrary, as the D.C. Circuit recognized years ago, strict enforcement of Section 8 does "not trammel, but . . . rather further[s] the effectuation of that Railway Labor Act, for it ensures compliance by complainant carrier or union which cannot seek an injunction until and unless it has discharged the obligations imposed by the Railway Labor Act."  *Akron & Barberton Belt R.R.*, 385 F.2d at 614; *see also Local 553, Transp. Workers Union of Am. v. E. Air Lines, Inc.*, 695 F.2d 668,679 (2d Cir. 1982) ("Section 8 of the Norris-LaGuardia Act, however, does not conflict with the RLA. . . . Since section 8 is congruent with the RLA, Local 553 should be held to section 8's requirements . . . ."); *Local 553, Transp. Workers Union of Am. v. E. Air Lines, Inc.*, 544 F. Supp. 1315, 1331 (E.D.N.Y. 1982) ("[Section] 8 does not conflict with the mandatory status quo provisions of the RLA.  Rather, [Section] 8 is in harmony with the purposes of the RLA."), *modified on other grounds*, 695 F.2d 668.  In applying Section 8 in *Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27 v. Toledo, P. & W. R.R.*—a case that involved the RLA—the Supreme Court said the same: "The policy of the Railway Labor Act was to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes.  The over-all policy of the Norris-LaGuardia Act was the same. . . .  It is dominant and explicit in Section 8."  321 U.S. at 58–59 (citations omitted); *see also In re Dist. No. 1—Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n (AFL-CIO)*, 723 F.2d 70, 80 (D.C. Cir. 1983) (noting that *Toledo* held that Section 8 had not been satisfied "without even mentioning [Section]

4"). There is thus no need to read another exception into the NLGA to accommodate the RLA.**[4]**

---

**[4]** The dissent relies on two Supreme Court cases interpreting Section 4 for the proposition that the "jurisdiction-stripping provisions of the Norris-LaGuardia Act do not apply to disputes, such as this one, where the parties have not first engaged in any of the procedures of the Railway Labor Act." Dissent at 44.   Again, neither of these cases speak to the proper accommodation between Section 8 and the RLA.  The Court in *Chicago River* did not discuss the applicability of Section 8 to the case before it. And in *Chicago & North Western Railway Co. v. United Transportation Union*, the Court considered only the "question [of] whether § 4 of the Norris-LaGuardia Act prohibit[ed] the use of a strike injunction." 402 U.S. 570, 581 (1971) (footnote omitted); *see also* Brief for the Petitioner at 8 n.6, *Chi. & N.W. Ry. Co.*, 402 U.S. 570 (No. 70-189), 1970 WL 136733 (noting that the "lower courts never reached the question [of whether Section 8 barred the injunction at issue], and it is not pertinent to the issue presented here").  We address a question left unanswered by those cases.

The dissent also fails to engage with any of the cases cited above that give Section 8 a much wider scope, instead claiming that our position "creates a circuit split."  Dissent at 35.  Yet three of the cases cited by the dissent never mention Section 8.  This could perhaps mean that these courts assumed without comment that the RLA trumped Section 8—but it could just as easily mean that, like the Fifth Circuit, these courts did not consider whether "[Section] 8 of the Norris-LaGuardia Act" applied because it "was not advanced as a basis for denying an injunction against the strike," *Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 416 F.2d 998, 1003 n.4 (5th Cir. 1969) (citing *Butte*'s discussion of Section 8 but recognizing that "[w]e take the case as we find it"). Moreover, the lone case in this purported "split" that does discuss Section 8 actually cuts against the dissent's position.  In *United Airlines*— immediately following the sentence quoted by the dissent—the court reaffirmed the Seventh Circuit's longstanding position that the RLA does not categorically supersede Section 8, noting that things would have been different if the union had a "stronger case for barring the injunction under [Section] 8 of the NLGA." 243 F.3d at 365 & n.11.  But even if we were to read these four cases as the dissent suggests, they merely add to the circuit split, and possible intra-circuit splits, noted above.

Consistent with our own precedent and that of many other courts, we reaffirm that a party seeking an injunction under the RLA is not relieved of its obligation to comply with the provisions of Section 8 of the NLGA.[5]

## C.  Application of Section 8 to this Dispute

Section 8 provides in relevant part that "[n]o restraining order or injunctive relief shall be granted to any complainant . . . who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."   29 U.S.C. § 108.   Though the precise requirements of this obligation vary from case to case, there are "certain minimum steps" that are usually required:

> Unfair surprise should be avoided whenever possible.  The representatives of management should meet with those of labor.  Each side should listen to the contentions of the other side and each side should explain its position clearly and honestly, but not for as long a time as is customary in full-scale bargaining.  In short, men of good faith must in good faith get together in a sincere effort to resolve their differences.

---

[5] Section 8 also prohibits an injunction if the complainant "has failed to comply with any obligation imposed by law which is involved in the labor dispute in question."  Though Defendants do not invoke this provision here, the dissent does not explain why—in a different case involving the RLA—Congress would have intended to allow carriers or employees to escape the obligation to follow the law before seeking injunctive relief.

*Rutland Ry. Corp.*, 307 F.2d at 41. These basic requirements are consistent with the Supreme Court's broad construction of Section 8. *See Toledo*, 321 U.S. at 57 ("One must not only discharge his legal obligations. He must also go beyond them and make all reasonable effort . . . .").

Our past decisions construing Section 8 have fleshed out these principles. In *Switchmen's Union of North America*, we faced a dispute over the "bumping" of a railroad yardmaster. 398 F.2d at 445–47. In dismissing the union's argument that Section 8 divested the district court of authority to issue an injunction, we concluded that the carrier had fulfilled its obligations both because "there was no unfair surprise" in the bumping of the yardmaster and because the carrier had attempted, "in good faith," "to confer on the issue prior to the incident which led to the strike." *Id.* at 447. *San Antonio Community Hospital v. Southern California District Council of Carpenters* concerned a union's decision to display a banner disparaging the cleanliness of the workplace. 125 F.3d 1230, 1233 (9th Cir. 1997). Considering the Section 8 issue, we held that it was sufficient that the employer "had engaged the Union on a number of occasions in an effort to resolve this dispute before seeking an injunction." *Id.* at 1238.

In this case, nothing in the record permits us to hold that ASIG satisfied Section 8's "reasonable effort" requirement. Although the district court erred by failing to undertake a Section 8 analysis, the record reveals that ASIG sought an injunction from the district court without first attempting to

settle the dispute.[6]  Even if the employees lacked an identified union representative, that did not relieve ASIG of its obligations under Section 8 to make "every reasonable effort" to resolve the disagreement before seeking the injunction. We need not map out the precise contours of Section 8 here because ASIG's failure to make *any* efforts to settle the dispute fell short of what Section 8 requires, and thus the district court erred by entering the injunction.[7]

The dissent responds by seeking to divert attention away from the conduct of ASIG.  As far as we can tell, however, there is no authority for the dissent's proposition that the actions of the employees may relieve the carrier from satisfying Section 8's prerequisites.  The dissent cites *Switchmen's Union of North America*, *Trans International Airlines*, *Order of Railway Conductors & Brakemen*, and *Butte* as support for this proposition, but not one of these cases mentions the employees' conduct as relevant to the Section 8 inquiry.  In *Switchmen's Union of North America*, we rejected the union's Section 8 argument because the *carrier* had "performed its obligations under . . . the Railway Labor Act."  398 F.2d at 447.  In *Trans International*

----

[6] The dissent chides us because there is "no district court finding of fact to that effect," dissent at 56, but ASIG's explicit "position is that it had no obligation to negotiate unless and until a representative was certified." ASIG has never contended—as the dissent does now—that its single meeting with Popescu satisfied Section 8's requirements.

[7] Like the dissent, ASIG argues that even if it did not comply with Section 8 "the balancing of hardships and the public interest weigh in favor of issuing the injunction."  *See United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 365 n.11 (7th Cir. 2001).  This court, however, has never recognized a public interest exception to the plain language of Section 8, and we decline to do so here.

*Airlines*, we rejected the union's Section 8 argument because the *carrier's* "own conduct" was "not sufficiently likely to be found illegal or otherwise wrongful that [it] should be prevented from seeking injunctive relief."  650 F.2d at 957. In *Order of Railway Conductors*, we noted that the carrier could not "claim[] an injunction against a strike" because *the carrier* had "positively rejected mediation." 366 F.2d at 105. In *Butte*, we noted that the carrier was "also necessarily denied" from seeking an injunction because *the carrier* "had not exhausted its administrative remedies." 268 F.2d at 60 & n.10.  Neither these cases nor the dissent can deny the *Toledo* rule that a carrier must establish that it made every reasonable effort before seeking an injunction.  321 U.S. at 56-57 ("If a *complainant* has failed . . . to make every reasonable effort to settle the dispute, he is forbidden relief." (emphasis added)). In the absence of any efforts by ASIG to comply with Section 8, the dissent's discussion of what the employees did or did not do is simply a red herring.**[8]**

We emphasize that our conclusion is modest: we hold that a party must comply with Section 8 of the NLGA before seeking an injunction under the RLA.    The dissent's

---

**[8]** We do not hold, as the dissent suggests, that injunctions are never available in RLA labor disputes.  If a party seeking an injunction has exercised "every reasonable effort" to resolve the disagreement, Section 8 will not serve as a bar.  What constitutes "every reasonable effort" will vary from case to case, and will depend in part on the actions (or inactions) of the opposing side.  *See Rutland Ry. Co.*, 307 F.2d at 40-41. The dissent is thus wrong to suggest that we hold that employers are barred from obtaining injunctions even if the employees refuse to negotiate or even if the employees are too fractured to engage in any meaningful negotiation.  We hold only that employers must exercise "every reasonable effort" before seeking an injunction; no "reasonable" effort, which is what we face here, cannot be "every reasonable effort." As noted *supra*, not even ASIG claims its efforts were reasonable.

suggestion that our holding will disrupt commerce is fundamentally mistaken.   As the Supreme Court has explained, "the purpose" of Section 8 "*is to head off strikes*," not encourage them.   *Toledo*, 321 U.S. at 65 (emphasis added).   Section 8's salutary mandate that parties make all reasonable efforts to settle labor disputes before seeking judicial intervention will help prevent, not cause, interruptions to commerce.   By contrast, allowing injunctions when the necessary steps "have not been taken, not only violates the section's terms," but encourages parties to act unilaterally and avoid the reasonable steps that "when achieved, make unnecessary invocation of the court's aid." *Id.*   This not only "defeats the purposes" of the NLGA, *id.*, but those of the RLA as well.   As noted above, the "over-all policy" of the RLA and the NLGA is the same: "to encourage use of the *nonjudicial* processes of negotiation, mediation and arbitration for the adjustment of labor disputes."   *Id.* at 58 (emphasis added).   Permitting a carrier to obtain an injunction to block a strike without pursuing these nonjudicial processes—as the dissent would have it—frustrates the goals of both statutes.

## IV.  CONCLUSION

Our decision will neither summon monsters from the deep nor rain frogs from the heavens to "destroy" the North American transportation system.   We do not hold that courts are prohibited from enjoining airport strikes.   Rather, our narrow holding—compelled by *Toledo* and consistent with that of the vast majority of courts confronting this issue—merely requires carriers to abide by Section 8's requirements before seeking an injunction.   Because the record lacks evidence that ASIG made every reasonable effort

to settle the dispute, we reverse the district court's order and vacate the preliminary injunction.

**REVERSED and VACATED.**

---

BERZON, Circuit Judge, with whom Judges PAEZ and GRABER join, concurring:

I agree with the majority that the district court erred in granting an injunction, as Aircraft Service International Group ("ASIG") has not complied with its duty under Section 8 of the Norris-LaGuardia Act ("NLGA") to make "every reasonable effort to settle [its] dispute" with the fuelers before seeking an injunction prohibiting the planned work stoppage. 29 U.S.C. § 108. I write only to explain that, in my view, even if ASIG had complied with its duty under Section 8, ASIG still would not have been entitled to an injunction.

The conflict underlying this case is undisputably a "labor dispute" for purposes of the NLGA.[1] As I explain below, it is *not* a dispute governed by any of the specific dispute resolution provisions of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq*. As the disagreement between ASIG and the fuelers falls wholly outside the RLA's regulatory framework, there is no federal labor statute that supersedes the NLGA's otherwise applicable prohibition on federal court injunctions during labor disputes. The district court therefore

---

[1] The parties agree that the conflict underlying this case is a "labor dispute" for purposes of the NLGA. *See* 29 U.S.C. § 113(c) ("The term 'labor dispute' includes any controversy concerning terms or conditions of employment . . . .").

lacks authority to enjoin the prospective work stoppage, even if ASIG complies with NLGA Section 8.

The majority does not say otherwise.  But this is an instance in which the narrow ruling may simply prolong litigation by inviting a second motion for an injunction, preliminary or permanent, after Section 8 compliance.  I would prefer to put this case to rest now.

## I.

The NLGA severely constrains federal courts' jurisdiction to issue injunctions concerning labor disputes, *see* 29 U.S.C. §§ 101–115, including entirely eliminating jurisdiction to issue injunctions in certain instances, *see id.* § 104.[2]

---

[2] Section 104 of the NLGA provides:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or

As the majority states, *see* Maj. Op. at 11–12, where the RLA unambiguously applies, the jurisdictional bar of the NLGA, 29 U.S.C. § 104, can give way. *See, e.g.*, *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 445 (1987). But "[t]his exception is necessarily a limited one," and is applicable only where a party violates an unambiguous, applicable provision of the RLA. *Id.* at 446–47. Given the express divestment of authority of NLGA Section 4, "the command of the [RLA] should be explicit and the purpose to afford a judicial remedy plain" before a court

---

other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

29 U.S.C. § 104.

may grant injunctive relief to enforce an obligation under the RLA. *Gen. Comm. of Adjustment of Bhd. of Locomotive Eng'rs for Mo.-Kan.-Tex. R.R. v. Mo.-Kan.-Tex. R. Co.*, 320 U.S. 323, 337 (1943) ("*M-K-T*"). This stringent rule recognizes that, "[f]aced with a choice between [an] ambiguity in the RLA and the unambiguous mandate of the [NLGA], we [are to] choose the latter." *Burlington*, 481 U.S. at 447. Any ambiguity eliminates federal courts' equitable jurisdiction to grant injunctive relief.[3]

## II.

The RLA does not regulate all relations between carriers and their employees. For example, a state-law wrongful discharge claim is not subject to the RLA's minor dispute resolution provision unless the dispute is grounded in the interpretation or application of a collective bargaining agreement. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 265–66 (1994). And the RLA does not regulate jurisdictional disputes between unions over the "overlapping . . . interests of two crafts. " *M-K-T*, 320 U.S. at 334–37. Instead, the RLA encompasses only "three classes of labor disputes and establishes a different dispute resolution procedure for each." *W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1302 (1987) (O'Connor, J., in chambers).

Specifically, the RLA governs "[m]ajor," "[m]inor," and "[r]epresentation" disputes. *W. Airlines*, 480 U.S. at 1302. "Major disputes" comprise a "class" of disputes "concerning 'rates of pay, rules or working conditions,' . . . [and] relate to 'the formation of collective [bargaining] agreements or

---

[3] The NLGA does not affect federal courts' jurisdiction to grant other relief, such as damages.

efforts to secure them.'" *Norris*, 512 U.S. at 252 (quoting *Consol. Ry. Corp. (Conrail) v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302 (1989)) (last alteration in original). "The second class of disputes, known as 'minor' disputes, 'gro[w] out of grievances . . . .'" *Id.* (quoting 45 U.S.C. § 151a) (first alteration in original). These involve "'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'" *Id.* at 253 (quoting *Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 33 (1957)). Therefore, under Congress's scheme, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U.S. at 302. Finally, "'representation' disputes involve defining the bargaining unit and determining the employee representative for collective bargaining." *W. Airlines, Inc.*, 480 U.S. at 1302. The dispute between ASIG and the fuelers here falls into none of the three relevant RLA categories.

The closest fit is the "minor" dispute category. The fuelers' concern is with the suspension of a fellow worker, i.e., Popescu. The RLA's mandatory arbitration mechanism applies, inter alia, to the resolution of minor "disputes between an employee or group of employees and a carrier . . . growing out of *grievances*," 45 U.S.C. § 153, First (i) (emphasis added), and thus *can* cover many disputes concerning whether a certain employee should have been disciplined or discharged. Indeed, employee discipline issues are often the subject of RLA minor disputes. *See, e.g.*, *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 72–76 (2009); *United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915 (9th Cir. 2013); *Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 280 F.3d 901 (9th Cir. 2002). But *Hawaiian Airlines, Inc. v. Norris* made clear that the word "grievances" in the RLA minor dispute resolution provisions refers *only* to

"disputes involving the application or interpretation of a CBA." 512 U.S. at 255. Left outside the RLA—and so subject to resolution under state law—are quotidian workplace disputes that do not concern the application or interpretation of a collective bargaining agreement, such as the one at hand. Precisely because the dispute here is so similar to a traditional grievance and could well be a minor dispute were a collective bargaining agreement in place between ASIG and the fuelers, it cannot be a major dispute, i.e., one involving employees seeking the formation of a future-oriented collective bargaining agreement.

The underlying dispute in this case is not a representation dispute for essentially the same reason—the workers are not seeking to collectively bargain regarding future terms and conditions of employment, and have no interest in choosing a representative of their group at this time. RLA Sections 2, Third, Fourth, and Ninth regulate the means by which employees *may* bind themselves to a representative for the purpose of negotiating with an employer. *See* 45 U.S.C. § 152, Third, Fourth, and Ninth. But none of those provisions contains an unambiguous obligation to select a representative where there is no desire to negotiate terms and conditions of employment with the employer. *See Burlington*, 481 U.S. at 447.

Section 2, Third, could conceivably be read in isolation to require that the employees elect a representative: "Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference . . . ." 45 U.S.C. § 152, Third. The immediately following section, however, Section 2, Fourth, states that "[e]mployees shall have the *right* to organize," rather than the *duty* to organize. 45 U.S.C. § 152, Fourth. In other words, Section

2, Fourth, gives the employees "the right to determine who shall be the representative of the group or, indeed, whether they shall have any representation at all." *Bhd. of Ry. & S.S. Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 670 (1965).    Read in combination with Section 2, Fourth, then, Section 2, Third, does not require representation.  Rather, it prohibits both the employer and the employees from "in any way interfer[ing] with, influenc[ing], or coerc[ing] the other in its choice of representatives." 45 U.S.C. § 152, Third.    As the Fifth Circuit concluded, "employees were given the right under the Act not only to opt for collective bargaining, but to reject it as well . . . . [T]he implicit message throughout the Act is that the 'complete independence' of the employees necessarily includes the right to reject collective representation.   Indeed, the concept of 'complete independence' is inconsistent with forced representation."    *Russell v. Nat'l Mediation Bd.*, 714 F.2d 1332, 1343 (5th Cir. 1983), *reh'g denied*, 721 F.2d 819, *cert. denied*, 467 U.S. 1204 (1984) (quoting 45 U.S.C. § 151a).

Nor does Section 2, Ninth compel the fuelers to seek union representation where they do not wish to be so represented.  Section 2, Ninth, provides, in part:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals

or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter.

45 U.S.C. § 152, Ninth. In terms, Section 2, Ninth, is limited to disputes "among a carrier's employees *as to who are the representatives* of such employees," and does not apply where there is no such dispute among the employees. *Id.* (emphasis added). For that reason, the D.C. Circuit has explained that the representation dispute mechanisms of Section 2, Ninth, may only be initiated *by employees* where "the requisite 'dispute' [among employees] . . . arise[s]": "Section 2, Ninth does not contemplate [an] action-initiating role[] . . . for carriers." *Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 665 (D.C. Cir. 1994) (en banc), *amended by* 38 F.3d 1224, *cert. denied sub nom. Burlington N. R.R. Co. v. Ry. Labor Execs. Ass'n*, 514 U.S. 1032 (1995).

The Second Circuit's opinion in *Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787, 795 (2d Cir. 1980) is consistent with this understanding. In *Summit Airlines*, the Second Circuit held that the representation dispute mechanisms of Section 2, Ninth are not "optional" where a union "*seek[s] to represent*" a class or craft. *Id.* (emphasis added). Consequently, a union cannot "resort directly to economic coercion" of a carrier where its object is to induce the carrier voluntarily to recognize the union as the representative of its employees. *Id.* Unless a union formally seeks and obtains certification as the employees' chosen

representative, the employer's duty to "treat" with, i.e. recognize, the representative, is not triggered. *Id.* at 793, 795. Thus, although an employer *may* voluntarily recognize a representative of a group of employees, the employer's *duty* to treat with a representative arises only where a representative is chosen through Section 2, Ninth's procedures. *Id.*; *see also Galveston Wharves*, 4 N.M.B. 200, 203 (1962).

In fact, according to the National Mediation Board, the fuelers at Sea-Tac are *incapable* of choosing among themselves a representative for dealing with their employer, as they are not a nationwide craft or class. *See Aircraft Serv. Int'l Group*, 40 N.M.B. 43, 49 (Nov. 20, 2012). The National Mediation Board's "longstanding practice is to conduct elections across a carrier's entire system," i.e. for class or craft units that are "system-wide" or "nation-wide" if the carrier operates nationally. *Delta Air Lines Global Servs.*, 28 N.M.B. 456, 460, 461 (2001). Because "[t]he craft or class must include all of the employees working in the classification deemed eligible, regardless of work locations," *Aircraft Serv. In'l Group*, 40 N.M.B. at 48, and because ASIG's employees are part of a "nationwide" system, *id.* at 52, the fuelers at Sea-Tac could not elect a representative for the group under Section 2, Ninth, even if they wished to do so.

It would thus be doubly nonsensical to require the fuelers to seek representation under Section 2, Ninth, where the RLA imposes no such unambiguous duty and the Sea-Tac fuelers could not validly elect a representative of themselves as a group. As the dissenter to the original panel decision in this case concluded, "[w]hereas the RLA simply grants employees a *right* to organize, [there is no] *obligation* on the employees

to seek unwanted representation." *Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters Local 117*, 742 F.3d 1110, 1128 (9th Cir. 2014) (M. Smith, J., dissenting). Rendering unionization compulsory violates the directive to favor "the unambiguous mandate of the [NLGA]" regarding enjoining labor disputes where there is "ambiguity in the RLA," and would impose an illogical and impossible-to-fulfill condition on the fuelers. *Burlington*, 481 U.S. at 447.

The district court nonetheless held that the fuelers' decision to strike was prohibited by the RLA because to hold otherwise would "wholly frustrate" RLA Section 2, First, which requires covered employers and employees "to exert every reasonable effort . . . to settle all disputes, whether arising out of the application of . . . agreements [concerning rates of pay, rules, and working conditions] or otherwise." 45 U.S.C. § 152, First. But as the Supreme Court has explained, Section 2, First, is not a stand-alone provision. *See M-K-T*, 320 U.S. at 334.

Longstanding precedent confirms that Section 2, First does not impose duties to refrain from acts not connected to those covered elsewhere in the RLA. *M-K-T* held that Section 2, First, "merely states the policy [of the RLA] which those other provisions [of the RLA] buttress with more particularized commands." 320 U.S. at 334. While *Chicago & North Western Railway v. United Transportation Union*, 402 U.S. 570 (1971), determined that Section 2, First, is judicially enforceable in some circumstances, that case held only that a party breaches the duty described in Section 2, First, where that duty implements some other command in the RLA.

Specifically, in *Chicago & North Western Railway*, after "the parties ha[d] exhausted the formal procedures of the Railway Labor Act," the union threatened to strike. 402 U.S. at 571, 573. The carrier persuaded a district court to enjoin any such strike, arguing that the union had not engaged in a good faith effort to discharge the obligations described in other RLA provisions, including the Union's alleged refusal to bargain with the carrier. *Id.* at 574. *Chicago & North Western Railway* held that such an injunction would be generally permissible, describing the content of the duty imposed by Section 2, First, by repeated analogy to "the duty under the National Labor Relations Act to bargain in good faith," which authorizes courts to "'pass[] judgment upon the quality of the negotiations.'" *Id.* at 574–75 (quoting Archibald Cox, *The Duty to Bargain in Good Faith*, 71 Harv. L. Rev. 1401, 1412–13 (1958)). It was in *this* sense— because it required parties to satisfy in good faith their more particularized duties—that the Court concluded that "[section] 2 First was intended to be more than a mere statement of policy or exhortation to the parties." *Id.* at 577.

*Chicago & North Western Railway*, then, rejected only the suggestion that *M-K-T* precluded reading Section 2, First as imposing a good faith requirement as to other, express duties elsewhere delineated in the RLA. *Id.* *Chicago & North Western Railway* left untouched the Supreme Court's pronouncement in *M-K-T* that Section 2, First, does not create a freestanding, independent duty.

Cases both before and after *M-K-T* and *Chicago & North Western Railway* confirm the understanding that RLA Section 2, First, is enforceable only in conjunction with another RLA provision. *Virginian Railway Co. v. System Federation No. 40*, 300 U.S. 515, 548–49 (1937), for example, held that there

is a duty to negotiate a first collective bargaining agreement, relying on the *combination* of RLA Section 2, First, *and* the obligation imposed by RLA Section 2, Ninth to "treat with" the properly chosen majority representative. *Summit Airlines* similarly determined that there is a duty to settle a demand for recognition as a collective bargaining representative in the *combination* of RLA Section 2, Ninth, which governs the resolution of dispute resolution mechanism, *and* Section 2, First. 628 F.2d at 791–95.

Accordingly, there is no basis for interpreting the word "dispute" in Section 2, First, as carrying a meaning entirely divorced from the particular disputes described elsewhere in the RLA. Where, as here, a dispute falls into none of the categories contemplated elsewhere in the RLA, Section 2, First, imposes no obligation to settle it, in good faith or otherwise.

## III.

This conclusion has negative as well as beneficial consequences for the fuelers. Although the RLA does not forbid them to strike, it does not protect that activity, either. "No private cause of action exists under the RLA for a group of employees who assert retaliatory conduct based upon employee activities which bear no relationship to establishing a union . . . ." *Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1023 (9th Cir. 1990); *accord Gullickson v. Sw. Airlines Pilots' Ass'n*, 87 F.3d 1176, 1186–87 (10th Cir. 1996); *Rachford v. Evergreen Int'l Airlines, Inc.*, 596 F. Supp. 384, 386 (N.D. Ill. 1984). Where, as here, employees have disclaimed any effort to form a union, and in fact are incapable of electing a representative under the RLA, *see Aircraft Serv. Int'l Group*, 40 N.M.B. at 48–49, they have no

recourse to the RLA if their employer retaliates against them for striking.

## IV.

In sum, the fuelers "do not need to find a particular provision in the RLA to *justify* [striking].  [Rather,] [t]he affected [carrier] must find a specific mandate of the RLA that *prohibits* the [strike]" to be entitled to an injunction.  *Ry. Labor Execs. Ass'n v. Wheeling & Lake Erie Ry. Co.*, 914 F.2d 53, 56 (4th Cir. 1990).  As no specific mandate of the RLA prohibits nonunionized employees from engaging in a strike as a first step of self-help, ASIG is not entitled to an injunction against this behavior.  Accordingly, the injunction should be vacated for that reason, as well as for the reason endorsed by the majority.

---

KLEINFELD, Senior Circuit Judge, joined by O'SCANNLAIN, SILVERMAN and TALLMAN, Circuit Judges dissenting:

We should affirm.  The district court and the panel opinion got it right.

The Railway Labor Act protects the public from the consequences of some labor strife with an especially grave impact on those other than the companies and employees involved.  That is why it mandates extensive negotiation, mediation, and arbitration procedures in any major

transportation dispute[1] before allowing lockouts or strikes. The anti-injunction provisions of the later Norris-LaGuardia Act cannot be read into the Railway Labor Act before that settlement process is undertaken, without gutting the Railway Labor Act.  By expanding the reach of the Norris-LaGuardia Act this way, the majority creates a circuit split.[2]  Shutting down the Seattle-Tacoma International Airport ("Sea-Tac") amounts to the blockade of a major American port which imposes harms on nonparticipants in the labor dispute that vastly outweigh the interests of the company and its employees.  That is why injunctions are available to enforce the Railway Labor Act notwithstanding the Norris-LaGuardia Act.

The injunction, together with the Railway Labor Act conciliation process, provides the statutory means Congress prescribed for making labor and management negotiate, whether they choose to or not.  The Railway Labor Act and the traditional four-part test for injunctions[3] together ensure, as they did in the district court, that airports be kept open while negotiations go on, regardless of whether one side or both may be unreasonable.  The final *Winter*[4] consideration,

---

[1] *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 723–24 (1945) (defining "major disputes" as those where employees "seek to create rather than enforce contractual rights" and "minor disputes" as those relating to "the meaning or proper application" of a collective agreement).

[2] *Compare United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 365 (7th Cir. 2001).

[3] *Cf. Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[4] *Id.* at 26.

the public interest, is in effect written into the Railway Labor Act.

## I.  Facts

The company in this case, Aircraft Service International Group, Inc. ("Aircraft Service"), refuels about 75% of the airplanes at Sea-Tac.  The company suspended one of its aircraft fuelers, Alex Popescu.  The company says it suspended Mr. Popescu because employees were concerned about their safety on account of his "blowups" at work, episodes that he attributed to a medical condition.  The general manager reported receiving complaints from employees that Popescu "went into a fit of rage" that appeared "borderline psychotic" and "was out of control and repeatedly had screamed obscenities at a supervisor." When, after suspension, the company tried to discuss Popescu's situation with him, he again yelled obscenities, "threw his chair across the room, and slammed the door as he left the room."

The employees have not voted to be represented by any union, so no labor union is involved.  So far as the record shows, no one is authorized to speak for Popescu but Popescu himself, and the company's attempt to speak with him failed because he walked out and slammed the door.  One of the adverse parties in this case is "Working Washington," which is not a union, but a group that describes itself as "a coalition of individuals, neighborhood associations, immigrant groups, labor unions, civil rights organizations, and people of faith." Working Washington's "Campaign Director" says that although Working Washington "is not seeking to become the bargaining representative" of the employees and has not

sought recognition, it advocates for better treatment of workers at the airport.

Working Washington's campaign director says that the employees are compelled to work with unsafe and inadequate equipment and that the company suspended Popescu because he had become a leader in public advocacy for safer and better equipment for the fuelers. According to the campaign director, the obscenity incident was a mutual exchange of yelled obscenities when Popescu complained of a broken drive shaft and the supervisor accused him of sabotaging it. The campaign director alleges that Working Washington distributed and collected strike ballots and held a press conference to announce that the fuelers had authorized a strike against Aircraft Service.

Working Washington's campaign director further states in his affidavit that the fuelers, at a gathering organized by Working Washington, "called the company's Human Resources Department in Denver to request an immediate end to [Popescu's] suspension." He states, "I believe that similar calls continued throughout the evening and into the next morning." The fuelers did not get a response. The record does not contain any non-hearsay evidence about these calls, or for that matter, evidence that there were even any company personnel in the Denver office "throughout the evening and into the next morning" to receive such calls. This alleged barrage of phone calls appears to be the basis for the majority's view that the employees sought to negotiate and that it was the company that stonewalled them.

Neither Working Washington nor the fuelers asked the National Mediation Board to intervene at that time. Neither did the company.    A few weeks after the strike

announcement, and after the temporary restraining order and preliminary injunction, six of the employees, including Popescu, wrote to the National Mediation Board, in their capacity as unrepresented individual employees, asking whether it provided any sort of dispute resolution services. The Board replied that it provided mediation services to carriers and to designated bargaining representatives of their employees, but not to individual employees or groups, so services were not available to the six employees because they had not been designated as the bargaining representatives for all the employees.

We do not know, there being no findings of fact on the point, whether Popescu's supporters really did try to meet with or call the company representatives, or whether the company acted unreasonably in not meeting with whoever claimed to represent its employees.  The majority says the strike cannot be enjoined because the company made no "reasonable effort" to settle the dispute. That purported fact is not established.  But it does not matter.  The Railway Labor Act generally requires *both parties* to negotiate, mediate, and arbitrate, before either of them can shut down the airport. The point of the statute is to protect the public against the externalities of the labor dispute, not merely to protect management or labor against hardheads on the other side of the table.

## II.  The Statutes

The Railway Labor Act is among the first statutes protecting labor and encouraging union organization.  Its first two objectives, written into the statutory language, are "to avoid any interruption of commerce" and "to forbid any limitation upon freedom of association among employees or

any denial . . . of the right of employees to join a labor organization."[5]  The Act, though encouraging unionization, applies to unrepresented employees as well, such as the fuelers in this case.  The plain text of the Railway Labor Act defines "employee" as "every person in the service of a carrier."[6]  Both carriers and "employees," whether unionized or not, must try to settle their disputes "to avoid any interruption to commerce"[7]:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.[8]

The Act generally requires the parties to confer, mediate, and arbitrate their disputes:

> The [Railway Labor Act] provides a detailed framework to facilitate the voluntary

---

[5] 45 U.S.C. § 151a.

[6] *Id.* § 151, Fifth.

[7] *Id.* § 151a.

[8] *Id.* § 152, First.

settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. The parties must confer, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo.[9]

The fuelers, or at least those persuaded by Working Washington, proposed to strike without going through these procedures, and they claim that they can do this because they are not unionized and because the company has not made a reasonable effort to settle the dispute. Judge N.R. Smith in the panel opinion noted:

---

[9] *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969) (citations omitted).

> Here, the Employees are unwilling to even 'go through the motions' under the [Railway Labor Act]; rather, they wish not to bargain but to strike.  In so doing, they present the very situation for which Congress enacted the [Railway Labor Act]: carrier employees collectively threatening a strike capable of single-handedly interrupting interstate commerce by shutting down an airport.[10]

These statutory duties are clear enough.  But what happens if one or both parties do not do what the Railway Labor Act says they should do?

The subsequently enacted Norris-LaGuardia Act, promulgated in 1932, might have been read to categorically prohibit injunctions to enforce compliance with Railway Labor Act settlement procedures.[11]  After all, the Norris-LaGuardia Act generally strips federal courts of jurisdiction to issue injunctions in labor disputes.[12]  This could have been read as a limit on remedies available under the Railway Labor Act.

---

[10] *Aircraft Serv. Int'l Inc. v. Int'l Bhd. of Teamsters*, 742 F.3d 1110, 1120 (9th Cir. 2014) (citation omitted).

[11] 29 U.S.C. § 101 ("No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.").

[12] *Id.*

But the Supreme Court did not read it that way. *Brotherhood of Railroad Trainmen v. Chicago River Indiana Railroad Co.*[13] held that the Railway Labor Act procedures are compulsory[14] and the district courts do indeed have jurisdiction to enjoin noncompliance.[15]  The Court explained that amendments strengthening the Railway Labor Act in 1934, subsequent to the Norris-LaGuardia Act, repaired the "major weakness" or "lack of any compulsion" in the 1926 version of the Railway Labor Act.[16]

The Court further held that "the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act,"[17] because the Norris-LaGuardia Act protects workers generally, but the Railway Labor Act "channel[s]" the economic forces of labor and management "into special processes intended to compromise them."[18]  The Court explained that injunctions prohibited by the Norris-LaGuardia Act "strip[] labor of its primary weapon without substituting any reasonable alternative."[19]  The Railway Labor Act, by contrast, provides labor with a "reasonable alternative," the mediation and

---

[13] 353 U.S. 30 (1957).

[14] *See id.* at 34.

[15] *Id.* at 42.

[16] *Id.* at 35.

[17] *Id.* at 42.

[18] *Id.* at 40–41.

[19] *Id.* at 41.

settlement process set out in the Act.  It applies to "all" disputes regarding "rates of pay, rules, or working conditions"[20] and to "every person in the service of the carrier."[21]  This reasonable alternative eliminates the need for the Norris-LaGuardia Act's jurisdiction-stripping provisions to even the playing field.[22]  The employees need not be a member of a union to invoke the Railway Labor Act because it facilitates selection of a representative for mediation regardless, so they need not have a dispute under a collective bargaining agreement to invoke it.  The Railway Labor Act establishes that employees as well as carriers must make every reasonable effort to settle disputes "whether arising out of such agreements *or otherwise*."[23]  The "or otherwise" language means that a collective bargaining agreement is not a prerequisite to the Act's application.

Any question about the breadth of *Chicago River* was answered by the Court in *Chicago & North Western Railway Co. v. United Transportation Union*.[24]  There, the Court held that "strike injunctions may issue when such a remedy is the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements."[25]  Such a holding gives effect to the broad congressional policy

---

[20] 45 U.S.C. § 151a(4).

[21] *Id.* § 151 Fifth.

[22] *See Chi. River and Indiana R.R. Co.*, 353 U.S at 41–42.

[23] 45 U.S.C. § 152 First (emphasis added).

[24] 402 U.S. 570 (1971).

[25] *Id.* at 583.

"[t]o avoid *any* interruption to commerce" by premature labor strikes.[26]   Indeed, the *Chicago & North Western* Court was particularly aware of the dangers of such interruptions.[27]   We now know, if we did not before this pair of cases, that the jurisdiction-stripping provisions of the Norris-LaGuardia Act do not apply to disputes, such as this one, where the parties have not first engaged in any of the procedures of the Railway Labor Act.

*Chicago & North Western*[28] and *Chicago River*[29] both rely heavily on legislative history in interpreting the Railway Labor Act.  Such history merely confirms the meaning of the clear text of the statute.  The Court held that statements during the Railway Labor Act hearings by "spokesmen of the two parties" should be given great weight in construing the Act.[30]  These statements confirm that petitioners cannot evade the Act's settlement procedures simply because they are not unionized.

Senator Watson declared that both attorneys for labor and management agreed on the scope of the law: "They all state to me that beyond any doubt in the world[,] all classes and groups and individuals are covered . . . every individual employee who has a grievance, or any group of employees, or any organization of employees, *or any person not a*

---

[26] 45 U.S.C. § 151a (emphasis added).

[27] *See Chicago & N.W. Ry. Co.*, 402 U.S. at 581 n.14.

[28] *See id.* at 576–78, 580–82.

[29] *See* 353 U.S. at 35–39.

[30] *Chicago & N.W. Ry. Co.*, 402 U.S. at 576.

*member of any organization of employees.*"[31]    During the House debates over the 1934 amendments, the topic resurfaced since it was "rumored . . . that this Senate amendment require[s] the employees of every railroad . . . to be unionized before they can get any benefit."    This supposition was again rejected, with Representative Crosser firmly stating that the amendment would "not require any such thing."[32]

Even when an injunction is the only practical, effective means of enforcing duties under the Railway Labor Act, the Supreme Court has held, in some cases, that Section 8 of the Norris-LaGuardia Act[33] does indeed qualify issuance of an injunction with a codified clean hands requirement.    The Court held in *Brotherhood of Railway Trainmen v. Toledo, Peoria & Western Railroad Co.*[34] that Section 8's "unclean hands" provision prohibited the district court from enjoining a strike under the Railway Labor Act because the railroad had failed to make every reasonable effort to settle the dispute.

---

[31] 1 *The Railway Labor Act of 1926: A Legislative History* 689–91 (Michael H. Campbell & Edward C. Brewer III eds., 1988) [hereinafter *Legislative History*] (emphasis added).

[32] *Legislative History*, *supra* note 31, at 1021.

[33] 29 U.S.C. § 108 ("No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.").

[34] 321 U.S. 50 (1944).

The difference between the situation in *Toledo, Peoria* and our case is that the railroad and the union in *Toledo, Peoria* had indeed gone through the Railway Labor Act process prior to the strike.  In our case, the order of events is strike first, mediation maybe later, maybe never.  In *Toledo, Peoria*, it was Railway Labor Act procedures first, strike later, when the railroad refused to complete the Railway Labor Act process by arbitrating.  What made the unclean hands provision of Section 8 of the Norris-LaGuardia Act applicable was the railroad's rejection of "the final and crucial step of arbitration."[35]

We have similarly interpreted Section 8 to apply in situations where both parties have engaged in the Railway Labor Act procedures, but then one of them has abandoned the process in bad faith.  In *Switchmen's Union of North America v. Southern Pacific Co.*, we upheld a carrier's injunction notwithstanding Section 8 because the carrier had not "failed to perform its obligations under . . . the Railway Labor Act, or . . . lacked good faith in attempting to settle this dispute."[36]    In *Trans International Airlines, Inc. v. International Brotherhood of Teamsters*, we rejected both the union and the carrier's clean hands arguments in a dispute where the carrier and union had negotiated and mediated, but the union had refused arbitration.[37]  In *Order of Railway Conductors & Brakemen v. Spokane, Portland & Seattle Railway Co.*, we prohibited the carrier's injunction when the

---

[35] *Id.* at 64.

[36] 398 F.2d 443, 447 (1968).

[37] 650 F.2d 949, 953–54, 957 (9th Cir. 1980) (Kennedy, J.) (upholding one injunction and reversing another on different grounds).

union sought mediation, but the carrier declined.[38]  In *Butte, Anaconda & Pacific Railway Co. v. Brotherhood of Locomotive Firemen & Enginemen*, we prohibited the carrier's injunction under Section 8 when the carrier abandoned mediation.[39]  To get the benefit of *Toledo, Peoria* and to be able to bar the injunction, employees must participate in the Railway Labor Act dispute resolution process, as the unions and carriers did in these earlier cases.

The majority argues that our emphasis on the conduct of the fuelers is a "red herring" because Section 8 only applies to the "complainant," and that "no authority" relieves a carrier from the mandates of Section 8.  That reading eviscerates the statutory command that "[i]t shall be the duty of . . . employees," not just carriers, "to exert every reasonable effort . . . to settle all disputes . . . in order to avoid any interruption to commerce . . . ."[40]  The majority cites no case in this or any other circuit where Section 8 of the Norris-LaGuardia Act barred a Railway Labor Act injunction, where the employees went on strike without first engaging in *any* of the Railway Labor Act procedures.  There is no such case because such an application would frustrate the purposes of the Railway Labor Act.  The majority's "modest" rule allows employees of a carrier to strike without fear of injunction as long as they are not unionized and some rump group without representational authority makes some late night phone calls demanding talks with the carrier.

---

[38] 366 F.2d 99, 105 (9th Cir. 1966).

[39] 268 F.2d 54, 57, 60 n.10 (9th Cir. 1959).

[40] 45 U.S.C. § 152 First.

Like *Chicago River* and *Chicago & North Western*, *Toledo, Peoria* relies on legislative history in construing Section 8 narrowly in the Railway Labor Act context. Representative LaGuardia assured Congress that the Railway Labor Act "provides every detail for the settlement of disputes" and that "[t]he workers could not and would not think of going on strike before all the remedies provided in the law have been exhausted."[41]  Recognizing this, the Court in *Toledo, Peoria* establishes that a carrier must have had the opportunity to engage in the Railway Labor Act procedures before Section 8 would apply:

> [I]n response to an inquiry whether or not Section 8's requirements would apply where it might be impossible to move for settlement by negotiation, mediation or arbitration, [Representative LaGuardia] stated: "The answer to that is simple. In seeking a restraining order a party believed to be aggrieved comes into court and under a certain state of facts, which are enumerated in the bill itself, asks for a restraining order. *If time has not permitted him or the corporation to avail itself of the existing governmental machinery for the settlement of a labor dispute, he recites that as one of his facts, which is a full compliance, of course, with the provisions of section 8,* which makes it a condition precedent that every remedy must

---

[41] *See* 75 Cong. Rec. 5504; *Toledo, Peoria*, 321, U.S. at 59.

be exhausted to settle the strike before the injunction will issue."[42]

Contemporary methods of statutory construction might not rely as heavily on legislative history as the Supreme Court did in *Chicago River*, *Chicago & North Western*, and *Toledo, Peoria*. But the Court did so rely, and in *Chicago & North Western* held that because the Railway Labor Act was a "legislative product devised by the parties themselves, which Congress enacted,"[43] it should be construed with "particular attention . . . to the legislative history of the Act."[44] We are thus required by *Chicago & North Western* to use legislative history to construe the Railway Labor Act. Doing so, we should join the Seventh Circuit's *United Air Lines* decision,[45] construing the relationship of the Norris-LaGuardia clean hands provision to the Railway Labor Act as Representative LaGuardia said it should be construed. *United Air Lines* holds that Section 8 of the Norris-LaGuardia Act does not relieve employees of their duties under the Railway Labor Act to settle disputes and avoid interruptions to commerce. It further holds that a carrier may be entitled to an injunction even where negotiation has not yet taken place. *United Air Lines* explains that to "requir[e] a carrier to seek a negotiated solution before moving to enjoin an illegal work action would enable unions to use such actions to extort concessions from

---

[42] *Toledo, Peoria*, 321 U.S. at 59 n. 16 (quoting 74 Cong. Rec. 5508) (emphasis added).

[43] *Chicago & N.W. Ry. Co.*, 402 U.S. at 589.

[44] *Id.* at 588.

[45] *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 365 (7th Cir. 2001).

the carrier during the negotiation process. Such a result would render the union's duty under 45 U.S.C. § 152, First a nullity . . . ."[46] Today, the majority does indeed render the employees' duty to follow the Railway Labor Act procedures a nullity, by depriving the courts of the ability to enforce the Railway Labor Act.

### III.  The Public Interest

The reason injunctions are so important to the Railway Labor Act conciliation system is that strikes in the transportation industry have so great an impact upon uninvolved parties:

> Railway (and airline) labor disputes typically present problems of national magnitude. A strike in one State often paralyzes transportation in an entire section of the United States, and transportation labor disputes frequently result in simultaneous work stoppages in many States.[47]

A little bit of concrete history shows this impact. In 1934, Alaska and many other West Coast states suffered the effects of a massive longshoremen's strike. On May 9, 1934, West Coast longshoremen not covered by the Railway Labor Act[48] called a strike that effectively closed the port of Seattle and

---

[46] *Id*.

[47] *Jacksonville Terminal Co.*, 394 U.S. at 381.

[48] Longshoremen are only covered by the Railway Labor Act if they are employees of a carrier. *See* 45 U.S.C. § 151.

every other major port on the West Coast.[49]   In less than a week, Alaska lost mail service.[50]   After two weeks, the Anchorage Chamber of Commerce estimated that the city had only 10 more days' supply of eggs, butter, and flour, and that the whole territory would be without general supplies in thirty to sixty days.[51]   Members of the general public bore the immense costs of the strike.   Sixteen mills closed in Washington and Oregon and an estimated 10,000 people lost their jobs because the mills could not "get raw materials or send products by water."[52]  By the end of the 86-day strike,[53] eight lives had been lost.[54]   The financial stake disputed by the union and carriers was doubtless a small fraction of the $200,000,000 in total lost revenue at ports from Bellingham

---

[49] *Longshoremen Out on Strike; Shipping Halted*, The Seattle Daily Times, May 9, 1934, at 10.  This and other issues of The Seattle Daily Times cited in this opinion are available online through the newspaper collections of the *Harry Bridges Center for Labor Studies*, *University of Washington*, http://depts.washington.edu/dock/34strike_news_coverage.shtml.

[50] *Alaska Mail Held; Sound Mills Quit; U.S. Action Asked*, The Seattle Daily Times, May 15, 1934, at 1.

[51] *Strikers Receive Ultimatum; To Load U.S. Alaska Ship*, The Seattle Daily Times, May 24, 1934, at 10.

[52] *Ryan's Order to Relieve Alaska is 'Mandatory*,' The Seattle Daily Times, May 25, 1934, at 15.

[53] *3,000 Back on Job Here As Maritime Tie-Up Ends*, The Seattle Daily Times, July 31, 1934, at 1.

[54] *Strikers Work in All Ports on Pacific Coast*, The Seattle Daily Times, July 31, 1934, at 5.

to San Diego, not including additional losses to individuals and local businesses.[55]

Three of our sister circuits[56] have upheld injunctions under the Railway Labor Act's Section 152, First, notwithstanding the Norris-LaGuardia Act's jurisdiction-stripping provisions, because of the devastating impacts on the public associated with transportation strikes. Though these decisions evidently did not find it necessary to explicitly discuss Section 8 of the Norris-LaGuardia Act, they illustrate the proposition that the employees of a carrier have a separate enforceable duty under the Railway Labor Act to resolve disputes to avoid interruption of commerce, and that they should not be allowed to strike if they disregard this statutory duty.

The Eleventh Circuit held in *Delta Airlines v. Air Line Pilots Association* that "when a specific provision of the [Railway Labor Act] is implicated, and there is no other effective way to enforce [it], the [Norris-LaGuardia Act] does not prohibit a federal court from issuing an appropriate injunction."[57] The Eleventh Circuit reasoned that "[w]hen the public interest, commerce and a clear statutory provision are implicated, we will not shy away from holding the parties to

---

[55] *Id.*

[56] *See Nat'l R.R. Passenger Corp. v. Transport Workers Union of America*, 373 F.3d 121 (D.C. Cir. 2004); *Burlington N. & Santa Fe Ry. Co. v. BMWE*, 286 F.3d 803 (5th Cir. 2002); *Delta Airlines, Inc., v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001).

[57] *Delta Airlines*, 238 F.3d at 1307.

their duties under the [Railway Labor Act] so as to avoid 'any interruption to commerce.'"[58]

In *Delta Airlines*, Delta pilots engaged in a concerted effort to decline taking "open time" flights.[59]  As a result, Delta had to cancel many flights and the "traveling public" suffered immeasurable losses of time and money from delays and cancellations.[60]  The Eleventh Circuit rejected the argument that the union had no duty to try to stop the pilots because the union had not sanctioned their actions.  To the contrary, the Eleventh Circuit held that the union did have such a duty,[61] and if it could not prevent the strike, the district court had jurisdiction to enjoin the individual pilots' concerted action.[62]

In *National Railroad Passenger Corp. v. Transport Workers Union of America*, the District of Columbia Circuit upheld a strike injunction,[63] despite the Norris-LaGuardia Act,[64] even though the "dispute [was] not amenable to resolution via the procedures of the [Railway Labor Act]."[65]

---

[58] *Id.* at 1308 (quoting § 152, First).

[59] *Id.* at 1302.

[60] *Id.* at 1309.

[61] *Id.* at 1309.

[62] *Id.* at 1311 (citing § 152, First).

[63] *Nat'l R.R. Passenger Corp.*, 373 F.3d at 127.

[64] *Id.* at 123.

[65] *Id.* at 126.

In that case, when federal Amtrak subsidies fell below expected levels, five unions representing Amtrak employees called a strike.[66]  The district court had held that the Railway Labor Act did not bar the strike "because the Unions' dispute with Congress and with the administration over Amtrak funding *cannot be resolved by negotiation, mediation or arbitration with Amtrak.*"[67]  The D.C. Circuit disagreed: "[T]he possibility that a politically tinged dispute cannot be 'resolved' by negotiation does not warrant a wholesale exception to the mandates of the [Railway Labor Act]."[68]  The D.C. Circuit enjoined the strike because it had the "same adverse effect on interstate commerce as a strike motivated by more conventional labor concerns."[69]

The Fifth Circuit similarly held in *Burlington Northern v. Brotherhood of Maintenance of Way Employees* that the Railway Labor Act's requirement to "'exert every reasonable effort to make and maintain'" agreements could be enforced by injunction whenever there is a threat of "'any interruption to commerce.'"[70]  The Fifth Circuit was persuaded "by the plain text of the statute, by the reasoning of the District of

---

[66] *Id.* at 122.

[67] *Id.* at 123 (internal quotations omitted) (emphasis in original).

[68] *Id.* at 126.

[69] *Id.* (internal quotations omitted).

[70] 286 F.3d 803, 807 (2002) (quoting 45 U.S.C. § 152, First) (citation omitted).

Columbia and Eleventh Circuits, and by the desirability of avoiding a circuit split."[71]

Therefore, notwithstanding the anti-injunction provisions of the Norris-LaGuardia Act it is clear that: (1) when the public interest, interruption of commerce, and a clear statutory provision of the Railway Labor Act are implicated, federal courts can enjoin concerted action by transportation employees acting without a union;[72] and (2) negotiation prior to an injunction is not a precondition to enjoining a strike since all transportation strikes can have catastrophic effects on interstate commerce.[73]

The Seventh Circuit and the District of Columbia Circuit have held that a public interest exception to Section 8 of the Norris-LaGuardia Act allows injunctions under the Railway Labor Act, even when Section 8's requirements are not satisfied, because of the catastrophic effects of transportation strikes on interstate commerce. *United Air Lines* holds that "the imperatives of the [Railway Labor Act] may override § 8, and that a party's lack of 'clean hands' under § 8 'may be overcome by a balancing of the interests, particularly where it is the public interest involved.'"[74] *Brotherhood of Railroad Trainmen v. Akron & Barberton Belt Railroad* also holds that

---

[71] *Id.*

[72] *See Delta Airlines*, 238 F.3d 1300; *accord Burlington N. & Santa Fe Ry. Co.*, 286 F.3d 803.

[73] *See Nat'l R.R. Passenger Corp.*, 373 F.3d at 123.

[74] *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 365 n.11 (7th Cir. 2001) (quoting *Air Line Pilots Ass'n v. United Air Lines, Inc.* 802 F.2d 886, 901 (7th Cir. 1986)).

"a lack of clean hands may be overcome by a balancing of interests, particularly where it is the public interest involved . . . and that [a] restraining order should issue forthwith to avoid jeopardizing the Railway Labor Act."[75]  The majority omits consideration of the public interest in whether the primary air hub in the Northwest is shut down.

## IV.  Aircraft Service and Its Fuelers

The central argument of the majority is that an injunction ought not to have issued because Aircraft Service failed to "make any efforts" to settle the dispute.  There is no district court finding of fact to that effect.  All we have are three affidavits, two from Aircraft Service and one from Working Washington.  The Aircraft Service representative at Sea-Tac says that he met with Popescu in person, joined by a human resources area manager by phone, but Popescu cursed at the area manager, threw his chair across the room, left, and slammed the door behind him.  That cannot be a failure to "make any effort" by the employer.  Working Washington's campaign director says that Popescu supporters called the company's human resources department throughout one evening and into the following morning and received no response.   These events amount to the company's unsuccessful attempt to settle with Popescu, and a few other employees' attempts to settle Popescu's issues with the company.  We lack authority, as an appellate court, to make a finding of fact, as the majority appears to do, that the company made no effort to settle.  They met with Popescu, and he threw a chair and walked out.

---

[75] *Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R. Co.*, 385 F.2d 581, 614 (D.C. Cir. 1967).

If, as the majority appears to believe, the affidavits are treated as establishing facts, then there would be sufficient evidence that Aircraft Service made the reasonable efforts required by Section 8 of the Norris-LaGuardia Act. We held in *Switchmen's Union of North America v. Southern Pacific Co.* that a carrier fulfilled its obligation under Section 8 when there was "no unfair surprise," and "the company, in good faith, [had] attempted to confer on the issue prior to the incident which led to the strike."[76] No employee could claim to be "unfairly surprised" by a suspension for "cussing out" his boss. Aircraft Service's refusal immediately to reinstate Popescu upon demand appears to have generated the vote to strike, but all three affidavits show that Aircraft Service attempted, in good faith, to confer with Popescu after his suspension and prior to the fuelers threatening to strike.

The real nub here, for Working Washington as well as Popescu and the six fuelers who wrote on his behalf, appears to be the company's refusal to meet and attempt to settle with them, not Popescu. The company, after all, did meet with Popescu. Aircraft Service's position was that it had no obligation to negotiate with Working Washington or those fuelers who made phone calls the night after Popescu was suspended. The National Mediation Board's position was that it too had no mediation available for the six Popescu supporters. They were both right.

Working Washington, as its campaign director says in his affidavit, is not a union and has not been selected as a representative by Aircraft Service's employees. Working Washington has many constituents including "neighborhood associations, immigrant groups, labor unions, civil rights

---

[76] 398 F.2d 443, 447 (1968).

organizations, and people of faith."  Aircraft Service cannot assume that Working Washington represents its employees. Working Washington selected them, instead of the employees selecting Working Washington.      Perhaps Working Washington would be looking out solely for the interests of Aircraft Service's employees, or perhaps it would be serving its constituents' interests and preferences and not Aircraft Service's fuelers' interests.      Likewise, the fuelers who allegedly called the human resources department, and the six fuelers who wrote to the National Mediation Board, have not established a right to represent all the other fuelers.

The company's affidavit says that employees wanted to get rid of Popescu because they feared he might damage their vehicles and his irrational rages created a safety threat to them.  Perhaps more fuelers wanted to get rid of Popescu than wanted to keep him, because they feared for their own safety on account of Popescu's erratic behavior.  Perhaps Aircraft Service has been protecting the interests of most of its employees, while Working Washington is sacrificing their safety to some other agenda.  We have no idea.  Proper selection of a representative answers the question whether some group or entity represents the employees.    An unsupported claim to speak on their behalf does not.

The Supreme Court held in *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R.R. Co.* that the Railway Labor Act "imposes upon the carrier 'the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other.'"[77]  The affirmative and the negative duty both arise out of the "essential foundation

---

[77] 320 U.S. 323, 335 (1943) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 548 (1937)).

of the statutory scheme," "[f]reedom of choice in the selection of representatives."[78]  The majority's expansive reading of Section 8 of the Norris-LaGuardia Act would repeal this central feature of the Railway Labor Act and deprive Aircraft Service's employees of what the Supreme Court characterized as a "liberty [that] should be safeguarded."[79]  That is the liberty of the employees to choose their own representative rather than having a representative forced upon them.

That right to pick the representative rather than having one imposed is why the Railway Labor Act creates a process for employees to select a mediation representative,[80] even if they are not unionized and do not choose to be represented by a union.[81]  Any question of whether Popescu's supporters, or Working Washington, ought to be negotiated with, or mediated or arbitrated with, is to be settled under the statute by the detailed procedures for designating representatives.[82] That explains why the National Mediation Board rejected the request for mediation by six individual fuelers.  After all, suppose the company negotiated and mediated, and reached an agreement satisfying Working Washington and Popescu's supporters, perhaps to reinstate Popescu with back pay.  That might leave a majority of the fuelers at what they considered too much risk to their personal safety from Popescu.  And

---

[78] *Id.* at 329–30.

[79] *Id.* at 330.

[80] 45 U.S.C. § 152, Third, Ninth.

[81] *Id.* § 152, Fifth.

[82] *Id.* § 152, Ninth.

Working Washington might be subordinating Aircraft Service's employees interests to the interests and preferences of the "labor unions, civil rights organizations, and people of faith" that comprise it. A company is not obligated to, and may not, under *Missouri-Kansas-Texas R.R. Co.*,[83] negotiate and try to settle its employee disputes with an organization its workers have not chosen, that may be serving interests conflicting with the interests of most of its employees.

The statute requires that "not less than 50 percent of the employees in the craft or class" select a representative.[84] Perhaps Working Washington, or the employees who support Popescu, or both, should represent the fuelers and can be trusted to represent their interests, not others. They can. All they need to do is follow the Railway Labor Act's straightforward process to get certified as their representative. Without that, they are in the position of a lawyer settling a case on behalf of a client who has not chosen to be represented by that lawyer, who perhaps represents someone else with a conflicting interest.

The record is uncontradicted that the company met with Popescu to discuss his suspension, but he slammed the door and walked out. Even were there some issue of fact about this, the injunction would still be within the district court's discretion. A fair reading of the Railway Labor Act and the Supreme Court decisions interpreting that law's relationship to the Norris-LaGuardia Act compels the conclusion that an injunction would still properly issue, compelling both sides to submit to the Railway Labor Act's dispute resolution

---

[83] 320 U.S. 323 (1943).

[84] 45 U.S.C. § 152, Twelfth.

procedures before any strike could take place.  That reading would be consistent with the Fifth, Seventh, Eleventh and District of Columbia Circuit's interpretation of the Railway Labor Act's Section 152, First.  Delaying an injunction until findings can be made on which side is the more unreasonably hardheaded, and denying an injunction if the petitioner is the more unreasonable, defeats the Railway Labor Act's first stated purpose, which is "to avoid any interruption to commerce."  That is why the district court quoted Section 152, First of the Railway Labor Act and explained that "Defendant's interpretation would wholly frustrate the [Railway Labor Act's] overriding mandate, which is to impose a duty on carriers and their employees to 'settle *all* disputes, whether arising out of the application of such agreements *or otherwise*, in order to avoid any interruption to commerce . . . .'"  The district court was right.

## V.  Conclusion

The district court had jurisdiction and properly exercised it, by enjoining a strike unless and until the parties proceeded through the Railway Labor Act's dispute resolution process. Keeping a major American airport open is too important to allow an evasion of that process by a rump group of employees or a purported spokesman that the employees have never authorized to speak for them.  Congress passed the Railway Labor Act to protect against the harm such a strike would impose on uninvolved people all over North America. Today's decision destroys that protection.